WILLAMETTE–WESTERN CORPORA-
TION, Plaintiff-Appellee,

v.

COLUMBIA PACIFIC TOWING COM-
PANY, Defendant-Appellant.

No. 71–2522.

United States Court of Appeals,
Ninth Circuit.

Aug. 23, 1972.

Ridgway K. Foley, Jr. (argued), Paul
N. Daigle, J. Laurence Cable, of South-
er, Spaulding, Kinsey, Williamson &

Schwabe, Portland, Or., for defendant-appellant.

William F. White (argued), of White, Sutherland & Gilbertson, Portland, Or., for plaintiff-appellee.

Before JERTBERG, ELY and HUF-STEDLER, Circuit Judges.

ELY, Circuit Judge:

Columbia-Pacific [hereinafter C-P] appeals from a portion of the District Court's judgment, allowing Willamette-Western [hereinafter W-W] to recover damages for injuries allegedly caused by C-P's employees to property belonging to W-W. C-P contends that since the insurers of the property paid W-W for the bulk of its losses, neither W-W nor the insurers can recover this payment from C-P. In the circumstances of this case, we are persuaded that C-P is correct, and we therefore reverse, in part, the District Court's judgment, 326 F.Supp. 851.

W-W owned a floating crane barge, the *Atlas*, which it had chartered to the Commission of Public Docks of Portland, Oregon. Although the *Atlas* was fully insured under a hull subscription policy obtained and maintained by the Commission, the charter agreement was not exclusive. W-W was permitted to put the *Atlas* to other uses when the vessel was not needed by the Commission. Pursuant to this authority, W-W chartered the *Atlas*, with a small crew to C-P on an hourly basis for a barge loading operation. Shortly after the loading was completed, the newly laden barge capsized, damaging both the *Atlas* and the dolphins [1] to which it was moored.

Contending that C-P's employees had caused the damage by negligently directing the loading operation, W-W filed its action. The trial was bifurcated. In the first stage, the issue of liability was litigated. The District Court rejected C-P's defense that W-W was itself responsible for the loading operation. Instead, it concluded that W-W was correct in contending that C-P's employees were in charge of the *Atlas'* operation and had caused the $39,540.19 damage for which recompense was sought. Thus, C-P was held liable.

The other part of the trial proceeding focussed upon C-P's argument that it should be excused from liability for $24,521.50 of the damages since W-W had recovered that amount, in return for six loan receipts, from the underwriters of the hull policy covering the *Atlas*.

The basis for C-P's position was the fact that the policy written on the *Atlas* provided:

"It is . . . agreed that no right of subrogation . . . shall lie directly or indirectly against the assured and/or charters and/or operators and/or lessees . . . ."

Since W-W was obligated, by the terms of the loan receipts it had given the underwriters in return for their payments, to pay to them any damages recovered in this action, C-P argued that allowing W-W to recover the sum paid by the underwriters would permit indirect subrogation contrary to the plain provisions of the contract. W-W advanced several arguments in rebuttal to that contention, and two were accepted by the District Court.

The court agreed with W-W (1) that C-P could not claim the benefit of the waiver-of-subrogation clause because time charters and those chartering the *Atlas* without knowledge of the hull policy were not the intended beneficiaries thereof. The court also held, (2), that, in any event, even if C-P were entitled to the protection afforded by the provision, it would be irrelevant here because this was not an action for subrogation. We have concluded that both of these determinations were erroneous.

We disagree that C-P was not a beneficiary. First, as we view the facts here, C-P was a demise, not a time, charterer. The critical issue in placing

---

I. A dolphin is a cluster of piles to which a boom is attached.

liability for damage to a vessel is one of control. If C-P directed the operation of the *Atlas*, then it was potentially liable for injury thereto. The District Court found that C-P's employees were "negligent in directing the loading operation." On this finding, we think it was also required that C-P be deemed a demise charterer.

■ It is true, as both W-W and the District Court have noted, that C-P did not assume the broad range of responsibilities normally undertaken by a demise charterer. *See e.g.,* In re Marine Sulphur Transport Corp., 312 F.Supp. 1081 (S.D.N.Y. 1970). That, however, is not controlling. Since the nature of a vessel must shape the critical terms of its charter, many of the obligations usually incurred in chartering a vessel cannot, logically, be said to constitute essential parts of crane barge charters. The *Atlas* was indeed a vessel of an unusual character. It was not intended to roam the oceans of the world; rather, it was docked, perhaps permanently, and required no navigation. It carried no cargo which needed to be stowed and cared for. The crew,[2] such as it was, required no victualing from either W-W or C-P, for it went home at night. The issue is thus distilled into a question of control over the *Atlas*, and in that context, that is, alone, the distinguishing characteristic of a demise charter. The District Court determined that C-P was empowered, by the agreement between it and W-W, to order that the barge be loaded, despite the objections of the crane operator employed by W-W.[3] That measure of control compels the conclusion that C-P was a demise charterer. *See, e.g.,*

Marstaller v. Albina Dock Co., 191 Or. 145, 229 P.2d 269 (1951); *cf.* Petition of Shaver Transp. Co., 287 F.Supp. 339, 342 (D.Or. 1967).

■ Secondly, we are not convinced that in order to benefit from the contractual waiver of subrogation, C-P must have had knowledge of the hull policy and the waiver provision at the time it chartered the *Atlas*. The policy waived subrogation against "charterers."[4] As we interpret that unambiguous language, its legal effect was to create a class of donee beneficiaries. *See, e.g.,* Waterway Terminals Co. v. P. S. Lord Mech. Contr., 242 Or. 1, 406 P.2d 556 (1965); Restatement of Contracts §§ 133, 139 (1932). As a member of the class, C-P gained rights under the contract at the time of its making. *See* Roberts v. (State Tax Comm.) Ellis, 229 Or. 609, 368 P.2d 342 (1962); Restatement of Contracts § 356 (1932); A. Corbin, Corbin on Contracts § 814 (1951). Those rights could not be lost without C-P's consent, whether or not C-P knew of the hull policy. *See* Great American Ins. Co., N.Y. v. Gulf Marine Drilling No. 1, 302 F.2d 332 (5th Cir. 1962); In re Marine Sulphur Transport Corp., *supra,* 312 F.Supp. at 1103, *cf.,* Slavens v. Standard Accident Ins. Co., 27 F.2d 859 (9th Cir. 1928). *See generally,* A. Corbin, Corbin on Contracts §§ 781, 807, 813 (1951; Supp. 1971). Since C-P has never waived the benefit of the subrogation waiver clause, it qualifies as a beneficiary entitled to enforce it. Consequently, if the sustaining of W-W's judgment would effect indirect subrogation, C-P's defense to the challenged portion of the damage award is valid.

---

2. We attribute no significance to the fact that W-W supplied part of the crew, including the crane operator. *See* United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); Marstaller v. Albina Dock Co., 191 Or. 145, 229 P.2d 269 (1951).

3. If the crane operator had the authority to stop the loading operation and did not do so, then the negligence which caused the accident could have been attributable

to W-W. *See* B. W. King, Inc. v. Consolidated Iron and Metal Co., 310 F. Supp. 471 (S.D.N.Y. 1970).

4. Such a waiver is, in its effect, not unusual in the marine chartering business wherein, typically, the owner [here, W-W] provides hull insurance on the vessel chartered. *See* G. Gilmore & C. Black, The Law of Admiralty 217 (1957). *Cf.,* National Garment Co. v. N. Y., C. & St. L.R. Co., 173 F.2d 32 (8th Cir. 1949).

 The District Court concluded that the fact that W-W had executed loan receipts in favor of the underwriters did not evidence an attempt at subrogation. We are not persuaded. Loan receipts are a well-known subrogation device. *See* R. Horn, Subrogation in Insurance Theory and Practice 67 (1964). While they are, in addition, often valuable procedural tools [*See, e.g.,* Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918)], no such worthwhile purpose supports their utilization in this case. Here, it appears from the record that they are being employed only to permit the underwriters to be reimbursed for the funds they had paid to W-W to secure the repair of the *Atlas* and the dolphins. As we interpret the contract, such utilization of loan receipts constitutes indirect subrogation. We are not unfamiliar with Oregon authority to the effect that loan receipts do not invariably operate as subrogation devices. *See, e.g., Waterway Terminals, supra.* Those cases are, we think, inapposite, for here, the only issue is the proper interpretation of the waiver clause.

 Since the contract is unambiguous, we cannot look beyond the document in attempting to determine precisely what the underwriters and W-W intended. Subsequent parol explanations and interpretations formulated by W-W and the underwriters are of no significance. *See, e.g., Great American Ins. Co., supra.*

When the inquiry is confined to the contract, it becomes clear that it was impermissible for W-W to sue for the amounts covered by the loan receipts. To permit it to do so would be to allow the underwriters freedom to escape the effect of the waiver clause whenever they wished. Such an interpretation would render the waiver clause meaningless, contrary to the parties' clear ex-

pression in the contract, of their intention to make a binding waiver.[5]

We therefore hold that C-P, as a charterer, is not liable for the sums which had been paid to W-W in return for loan receipts. Upon remand, the District Court will modify its judgment in that respect.

Reversed and remanded, with directions.

---

5. We do not mean to suggest that W–W and the underwriters cannot prospectively alter their agreement. They undoubtedly can in many cases. *See, e. g.,* A. Corbin, Corbin on Contracts, § 781. We only de-

cline to give effect to the efforts made here, obviously designed retroactively to restrict the rights of third party beneficiaries of the contract.