[No. 57163-5. En Banc. June 18, 1992.]

TOUCHET VALLEY GRAIN GROWERS, INC., *Appellant,* v.
OPP & SEIBOLD GENERAL CONSTRUCTION, INC.,
ET AL, *Respondents.*

336

*Paine, Hamblen, Coffin, Brooke & Miller,* by *John C. Riseborough* and *Diane M. Hermanson,* for appellant.

*Carney, Stephenson, Badley, Smith & Spellman, P.S.,* by *A. Richard Maloney* and *David W. Bever,* for respondent Opp & Seibold General Construction.

*Lukins & Annis, P.S.,* by *Eugene I. Annis* and *James D. Perkins,* for respondent Truss-T Structures.

*Davis Wright Tremaine,* by *Randall D. Zuke* and *David A. Barbe,* for respondent National Surety Corporation.

DORE, C.J. — This case involves questions of liability following the structural failure of a grain-storage building owned by the appellant, a farmers' cooperative. The respondents are the contractors that erected the building, the contractors' surety, and the subcontractor who fabricated the metal structure.

We rule as a matter of law that a valid subrogation waiver in the contract between the building owner, Touchet Valley Grain Growers, Inc., and the contractor, Opp & Seibold General Construction, Inc., insulates Opp & Seibold from liability to the extent of Touchet Valley's insurance coverage. We affirm the trial court's grant of summary judgment in favor of Opp & Seibold, but remand to determine whether insurance covered all losses.

We further hold that the subrogation waiver protects Opp & Seibold's surety, National Surety Corp., but does not protect the subcontractor and manufacturer, Truss-T Structures, Inc., because Truss-T was not a party to the contract or a beneficiary of it. As such, we affirm the trial court's grant of summary judgment for National Surety and its denial of summary judgment for Truss-T Structures.

Finally, we hold that Touchet Valley raised valid warranty claims against Truss-T Structures. Accordingly, we reverse the trial court's dismissal of those claims. We affirm the trial court's denial of Truss-T Structures' motion for summary judgment dismissing Touchet Valley's claims under the Washington product liability act (WPLA), RCW 7.72. We hold that Touchet Valley's damages constitute more than pure economic loss and, therefore, the WPLA applies.

FACTS

Principal Parties. Touchet Valley Grain Growers sued Opp & Seibold, National Surety Corp., and Truss-T Structures

over the collapse of Touchet Valley's "flathouse"[1] grain storage building in October 1985. Opp & Seibold constructed the steel-frame building under a contract negotiated in 1984 with Touchet Valley. Opp & Seibold, in turn, contracted with Truss-T Structures to design the building and supply its components. National Surety carried Opp & Seibold's performance bond for the $1.2 million contract price.

Contract Provisions. In the construction contract, "paragraph 12" contained the subrogation waiver clause at issue here. It provides:

> INSURANCE: The Contractor and any of its subcontractors shall procure and maintain, without limiting its obligations or liabilities in a company or companies licensed to do business in the state in which the Project is located, during the life of this Contract, such comprehensive bodily injury liability, property damage liability insurance, automobile bodily and property damage liability insurance and other insurance, all the foregoing to include contractual liability coverage, as shall protect it and the Owner and any subcontractor from any and all claims which may arise or result from operations under this Contract.
>
> The Owner shall obtain casualty insurance for the Project during construction.
>
> *Subrogation rights, if any, are expressly waived by each party to the extent of insurance coverage afforded on any claim, loss or casualty arising from or in connection with the Project.*

(Italics ours.) Clerk's Papers, at 37. Construction ended in July 1984, except for certain items that were not completed until November 1984. Touchet Valley canceled its casualty insurance when the principal work ended in July and added the flathouse to its property insurance with Ranger Insurance Company.

History. Evidence of faulty construction or design appeared in the spring of 1985, when the flathouse building's frame buckled at the roof. Opp & Seibold and Truss-T Structures attempted repairs, but on October 24, 1985, an

---

[1] A "flathouse" is a noncylindrical grain storage facility. It is basically a rectangular building with a heavy steel frame, sheet metal liner, and sheet metal walls and roof. The flathouse in this case is 1½ times the length of a football field.

exterior wall failed, spilling grain from the storage building and damaging roof beams beyond repair.

Touchet Valley claimed the failure resulted from design defects and sought to collect from Ranger Insurance in October 1985. After reviewing engineering assessments commissioned by itself and Touchet Valley, Ranger Insurance denied coverage. Touchet Valley then sought a declaratory judgment on the coverage issue in May 1986.

As Ranger Insurance and Touchet Valley disputed coverage, Opp & Seibold and Truss-T Structures undertook additional repairs in November 1985. But these allegedly caused more damage, allowing moisture and pests to destroy grain inside the building. In November 1986 Touchet Valley and Ranger Insurance agreed to defer the issue of Ranger's coverage until Touchet Valley received a determination of Opp & Seibold's, Truss-T Structures', and National Surety's liability for the collapse. Under this "Agreement to Retain Attorneys and Proceed with Litigation", Ranger Insurance "loaned" money to Touchet Valley to repair the flathouse. Touchet Valley agreed to repay Ranger from any judgment it recovered from the defendants, but maintains that Ranger never agreed to make payments nor made any payments under its insurance policy.

Against Opp & Seibold and National Surety, Touchet Valley alleged breach of contract and breach of duty of good faith and fair dealing. Against Opp & Seibold and Truss-T Structures, Touchet Valley claimed breach of implied warranties of fitness for a particular purpose and merchantability, breach of express warranties, and violation of the WPLA. The trial court granted summary judgment in favor of Opp & Seibold and National Surety, holding the insurance subrogation waiver barred their liability. The court determined the Ranger Insurance policy would cover the damage to the flathouse. The court also granted Truss-T Structures' motion for summary judgment dismissing the warranty claims, but refused to dismiss the tort claims under the WPLA against it, holding the subrogation waiver

in the construction contract did not protect the subcontractor.

The Court of Appeals, Division Three, certified the following questions to this court:

1. Whether in a product liability action a third party beneficiary analysis can be used when pursuing claims for breach of implied warranty; and

2. Whether the losses incurred by Touchet Valley were strictly "economic loss" within the meaning of RCW 7.72-.010(6), and whether other than economic losses can be recovered under the Washington product liability act.

## ISSUES

1. Did the subrogation waiver in the contract between Touchet Valley and Opp & Seibold apply to Touchet Valley's property insurance policy with Ranger Insurance Company, or was the waiver limited to insurance specified in the contract?

2. Can a subcontractor, not a party to the contract, assert the subrogation waiver contained in the Touchet Valley/Opp & Seibold contract?

3. Can a third party beneficiary recover for breach of implied warranty under Article 2 of the Uniform Commercial Code?

4. Is direct contractual privity necessary for asserting express warranty claims?

5. Do Touchet Valley's losses constitute "pure economic loss" precluding recovery under the Washington product liability act?

6. Is Opp & Seibold entitled to recover attorney's fees for this appeal?

Both sides extensively briefed the question of validity of Touchet Valley and Ranger's "loan receipt" agreement. Because we hold the subrogation waiver in the construction contract was valid, the issue is now moot as to whether the loan receipt was valid. But we note that such loan receipts will not defeat a valid subrogation waiver. *See Willamette-Western Corp. v. Columbia Pac. Towing Co.*, 466 F.2d 1390

(9th Cir. 1972). Opp & Seibold's liability will be determined only after insurance coverage is determined, and only to the extent that liability exceeds coverage. Because we hold Truss-T Structures cannot claim the benefit of the subrogation waiver, the validity of the loan receipt in no way affects its liability, if any. Likewise, we remand for determination by the trial court of whether all of Touchet Valley's losses are covered under its policy with Ranger Insurance Company.

## ANALYSIS

■■ Reviewing a summary judgment, this court makes the same inquiry as the trial court. *Herron v. Tribune Pub'g Co.*, 108 Wn.2d 162, 169, 736 P.2d 249 (1987). It assumes facts most favorable to the nonmoving party and the initial burden is on the moving party to show no genuine issue of material fact. If the moving party meets its burden, the nonmoving party must offer specific facts showing a genuine issue for trial. *Hash v. Children's Orthopedic Hosp. & Med. Ctr.*, 110 Wn.2d 912, 915-16, 757 P.2d 507 (1988).

## I
### THE SUBROGATION WAIVER CLAUSE

■ Subrogation is an equitable doctrine, the purpose of which is to avoid unjust enrichment. *General Ins. Co. of Am. v. Stoddard Wendle Ford Motors*, 67 Wn.2d 973, 976, 410 P.2d 904 (1966). Usually, subrogation allows an insurer to recover what it pays to an insured under a policy by suing the wrongdoer. The insurer steps "into the shoes" of its insured. R. Keeton & A. Widiss, *Insurance Law* § 3.10(a)(1) (1988). The insurer, the "subrogee", has rights equal to, but no greater than, those of the injured party. *Millican of Wash., Inc. v. Wienker Carpet Serv., Inc.*, 44 Wn. App. 409, 414, 722 P.2d 861 (1986); R. Keeton & A. Widiss, *supra*. Parties to a contract may waive their subrogation rights and, absent fraud, the waiver will be valid and enforceable. *Millican.*

Touchet Valley argues that the waiver here applies only to insurance stipulated in paragraph 12 of the contract, and

therefore does not apply to the Ranger Insurance policy. Touchet Valley also maintains that enforcing the subrogation waiver would be unfair, in essence penalizing it for its good fortune in carrying the Ranger policy.

We find no merit in these contentions. The plain language of the waiver states that subrogation rights are "expressly waived . . . to the extent of insurance coverage" on losses "arising from or in connection with the Project." Clerk's Papers, at 37. Moreover, evidence before the trial court shows that the subrogation waiver resulted from negotiation between Opp & Seibold and Touchet Valley. According to Touchet Valley's counsel, Opp & Seibold believed "the risks imposed . . . were acceptable so long as any problem encountered would be paid for by insurance . . .." Clerk's Papers, at 495. Based on this evidence, viewed in the light most favorable to the nonmoving party and absent any contention of fraud, we conclude that the subrogation waiver is valid. Therefore, insurance coverage must be determined between Touchet Valley and Ranger Insurance Company before any liability question concerning Opp & Seibold or National Surety can be decided. Accordingly, we remand to the trial court for determination of that issue.

We move next to Truss-T Structures' cross appeal of the trial court's denial of its motion for summary judgment. Truss-T Structures, the subcontractor, claims that the subrogation waiver extends to it. Truss-T points to the waiver's expansive language and reasons that the waiver bars *all* claims, without reference to specific defendants. It also contends that Opp & Seibold and Touchet Valley attempted a standard waiver based on the American Institute of Architects' (AIA) form construction contract, which protects subcontractors. *See* American Inst. of Architects, Document A101, Article 17 (1977). Finally, Truss-T argues that allowing Touchet Valley to sue it effectively imposes liability on Opp & Seibold, because Truss-T would sue Opp & Seibold.

These contentions are not persuasive. However expansive the language of this waiver, Truss-T nonetheless seeks bene-

fit of a contract to which it is not a party. The contention that the parties drafted a standard waiver, therefore one that extends to subcontractors, fails because the parties negotiated the subrogation waiver here. This subrogation waiver, unlike the AIA form contract, does not include subcontractors. Truss-T also offers a statement by Opp & Seibold's attorney, who reviewed the proposed contract, maintaining that he intended a "standard" subrogation waiver like the AIA clause when he proposed a waiver be added. But this statement can only be read as expressing concern for his client's interest.[2]

Finally, Truss-T's contention that Touchet Valley's suit against it will impose liability on Opp & Seibold assumes that the subcontractor would prevail in a lawsuit against Opp & Seibold. That is by no means certain from this record.

## II
### WARRANTY CLAIMS

The Court of Appeals certified to this court the question of whether a third party beneficiary analysis can be used to pursue claims for breach of implied warranties in a product liability claim. "Product liability claims" based on breach of express or implied warranties can be raised either in tort under the WPLA or in contract under the Uniform Commercial Code. *See* RCW 7.72.010(4); RCW 62A.2-313, .2-314, .2-315. Touchet Valley states that the warranty issues it raises are contract based and fall within the provisions of the U.C.C. Reply Brief of Respondent, at 15. Accordingly, we limit our discussion to implied and express warranty claims brought under the U.C.C. and do not address these issues with regard to the WPLA.

---

[2]Arguably, under *Willamette-Western Corp. v. Columbia Pac. Towing Co.*, 466 F.2d 1390 (9th Cir. 1972), Truss-T Structures was a donee beneficiary of the Opp & Seibold contract. But the subrogation waiver at issue in *Willamette-Western* specifically applies to "charters", a class to which the plaintiff in that case belonged. Here, the waiver appears to protect only Opp & Seibold and Touchet Valley from claims and no evidence supports a finding that the parties agreed not to sue *anyone* for problems arising from the project.

Breach of Warranty Claims Under the U.C.C.

Dismissing the warranty claims against Truss-T Structures, the trial court determined that privity did not exist under RCW 62A.2-318 between Truss-T, the manufacturer, and Touchet Valley, the end user. We reverse and reinstate Touchet Valley's breach of warranty claims. We hold that Touchet Valley is a third party beneficiary of implied and express warranties made by Truss-T Structures to Opp & Seibold, and as such is entitled to raise these warranty claims.

Because designing and selling building components by Truss-T Structures constitutes a transaction in goods, Touchet Valley's warranty claims are controlled by RCW Title 62A, Article 2 (Sales). RCW 62A.2-102, .2-105(1). RCW 62A.2-318 limits warranty claims against a *seller* to those brought by natural persons in a household or such others as might reasonably be expected to use the product.

■ Touchet Valley correctly argues that RCW 62A.2-318 limits only horizontal privity, that is, privity between the seller and the immediate purchaser. The type of privity at issue here is *vertical* privity — privity between a manufacturer and end users down the distribution chain. Unlike horizontal privity, which is governed by statute, development of vertical privity is found in case law. Official Comment 3, RCWA 62A.2-318. We note the Washington commentator's added emphasis:

> Official Comment 3 is most emphatic that this section is otherwise intended to be neutral on the question of whether a seller's warranties extend to other than the original buyer.

Washington Comment, RCWA 62A.2-318.

Truss-T argues that the Legislature's enactment of RCW 62A.2-318 deliberately rejected broader alternatives for § 2-318 presented by drafters of the Uniform Commercial Code. True, the National Conference of Commissioners on Uniform State Laws offered states more expansive vertical privity alternatives, but not until after Washington adopted § 2-318 in 1965. *See* Laws of 1965, 1st Ex. Sess., ch. 157, § 2-318, p. 2365; 2 W. Hawkland, *Uniform Commercial Code*

*Series* § 2-318 (1992). When Washington adopted U.C.C. Article 2, only one choice existed for § 2-318. And, as Hawkland explains, the U.C.C. drafters' strict definition of horizontal privity was not meant to restrict the concept of vertical privity. 2 W. Hawkland, *supra.*

We believe the commentary to RCW 62A.2-318 is unmistakable: vertical privity is a different concept from horizontal privity. We also believe the Legislature spoke clearly when it defined § 2-318 as neutral on vertical privity and left its development to the courts. We hold that vertical privity controls warranty issues here between a remote manufacturer and ultimate purchaser.

### A. Implied Warranties

Touchet Valley relies on *Kadiak Fisheries Co. v. Murphy Diesel Co.*, 70 Wn.2d 153, 422 P.2d 496 (1967), arguing that privity is satisfied because Touchet Valley is a third party beneficiary of the implied warranties Truss-T gave Opp & Seibold under RCW 62A.2-314 and RCW 62A.2-315. In *Kadiak*, this court held that a purchaser of a specially built marine diesel motor could sue the manufacturer for breach of implied warranties even though the purchaser bought the diesel motor from a retail dealer. The court found that the manufacturer's implied warranties of merchantability and fitness for a particular purpose given to its purchaser, the dealer, extended to the end user. The decision relied on the sum of interaction and expectations between the purchaser and the manufacturer: the manufacturer knew the identity, purpose, and requirements of the purchaser's specifications and shipped the motor directly to the purchaser. *Kadiak*, at 164-65. In addition, the manufacturer sent a company official, the regional sales representative, and a service technician to help with installation of the motor in the purchaser's fishing boat. Then, after repeated mechanical problems, the manufacturer attempted to fix the engine. *Kadiak*, at 165.

Truss-T Structures argues that Touchet Valley's reliance on *Kadiak* is misplaced because *Kadiak* was decided before the U.C.C. became effective in Washington. If anything,

Truss-T argues, case law has tightened the privity requirement. It cites several post-U.C.C. cases, all of which are distinguishable.

In *Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 727 P.2d 655 (1986), this court disallowed an action against a manufacturer for breach of implied warranties brought by parents of children injured while riding a motorscooter. The court held that the parents did not show privity between the manufacturer and ultimate purchaser. It relied on two decisions interpreting the horizontal privity provision of RCW 62A.2-318. *Baughn*, at 151 n.54 (citing *Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 592 P.2d 631 (1979); *Berg v. General Motors Corp.*, 87 Wn.2d 584, 555 P.2d 818 (1976)). However, *Baughn* is distinguishable from this case (and *Kadiak*) on the issue of implied warranties because the manufacturer was not actually involved with the ultimate purchaser and the analysis was not based on a third party beneficiary argument. *Cf. Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 623 P.2d 710 (1981); *Schroeder v. Fageol Motors, Inc.*, 12 Wn. App. 161, 528 P.2d 992 (1974), *rev'd in part on other grounds in* 86 Wn.2d 256, 544 P.2d 20 (1975).

Truss-T also cites *Chance v. Richards Mfg. Co.*, 499 F. Supp. 102 (E.D. Wa. 1980) to support its argument that courts have not relaxed the privity requirements. Even if *Chance* were binding authority, the court in *Chance* did not assess any substantial involvement between manufacturer and end user as in *Kadiak*. Nor did it analyze the privity requirement on the basis of a third party beneficiary contract.

█ The *Kadiak* analysis remains sound. Regardless of whether *Kadiak* predated the U.C.C. in Washington, it supplements the code unless displaced by a code provision. RCW 62A.1-103. Applying the *Kadiak* analysis to the facts before us, we note that Truss-T knew Touchet Valley's identity, its purpose, and its requirements for the grain storage building. Truss-T designed the building knowing the specifications were the purchaser's. As was its business practice, Truss-T delivered the components to Touchet Valley's con-

struction site. And, when the first beams buckled in March 1985, Truss-T joined Opp & Seibold to attempt repairs.

We find the sum of this interaction indistinguishable from *Kadiak*. We reverse the trial court and hold that Touchet Valley Grain Growers was the intended beneficiary of Truss-T's implied warranties to Opp & Seibold. Those warranties assured the merchantability of Truss-T's fabricated building components and their fitness for Touchet Valley's known particular purpose.

### B. Express Warranties

 Truss-T Structures argues that Touchet Valley's express warranty claims were not properly before the trial court because they were not part of the complaint. However, Touchet Valley addressed these claims in its response to Truss-T's motion and the trial court, by dismissing the warranty claims, acknowledged them in its order granting Truss-T partial summary judgment. Thus, our review is appropriate. *See Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 767-68, 733 P.2d 530 (1987).

Touchet Valley contends that Truss-T made express warranties in its advertising brochure, its price book and its purchase order. Touchet Valley further argues that Opp & Seibold acted as agent for Truss-T, thus Opp & Seibold's representations of quality and performance were also Truss-T's.

 Truss-T Structures reiterates that privity must be shown in an express warranty action between a remote manufacturer and an end user and claims no privity exists here. But we believe *Baughn* expands privity to include the express representations at issue here. "The privity requirement is relaxed, however, when a manufacturer makes express representations, in advertising or otherwise, to a plaintiff." *Baughn*, at 151-52. Recovery for breach of an express warranty is contingent on a plaintiff's knowledge of the representation. *Baughn*, at 152.

Advertising Brochure. The language we cite from *Baughn* incorporates the substance of RCW 62A.2-313(1). *Baughn*

rejected an express warranty claim because the claim was based on puffing in advertising, not on an express representation. This court held the representations "appear to be Honda's opinion *or commendation regarding minibikes* rather than affirmations of fact about the goods." *Baughn*, at 152.

RCW 62A.2-313 defines express warranties as (1) "[a]ny affirmation of fact or promise", (2) "[a]ny description" or (3) "[a]ny sample or model" by a seller relating to or describing the goods, when such representation forms the "basis of the bargain". RCW 62A.2-313(1)(a)-(c). Touchet Valley argues that a sales brochure produced by Truss-T promises, directly or by description, a building of certain quality, which Truss-T failed to deliver. In this brochure, Truss-T Structures[3] states that it "can design to your specifications" and that fabrication "is carefully checked by our quality control department." Clerk's Papers, at 1203, 1204. It also states Truss-T's designs will "meet the strictest building codes" and "[y]our particular requirements will determine the most suitable style of construction." Clerk's Papers, at 1205.

Truss-T counters that its brochure only generally describes its standards, products, and methods. It argues that Touchet Valley never suggested "that there is any deficiency in Truss-T's general qualifications or general product quality." Brief of Respondent, at 37. Their argument misses the point: Truss-T tells the ultimate customers, not its dealers, that its designs will be tailor-made and of highest quality. Here, Touchet Valley claims that its grain storage building was improperly designed or constructed, and was not of highest quality, since it collapsed.

*Price Book and Purchase Order.* Touchet Valley claims provisions in Truss-T's price book, labeled "standard warranty", and in its purchase order guaranteeing quality assurance, benefits Touchet Valley. In particular, it points out that the price book warranty guarantees materials for a

---

[3]Truss-T Structures markets its steel buildings under the name Pacific Building Systems.

year. *See Lidstrand v. Silvercrest Indus., supra; Schroeder v. Fageol Motors, Inc., supra.*

Truss-T argues that a set duration in a warranty provision does not benefit the end user here, because neither *Lidstrand* nor *Schroeder* supports "the proposition that a manufacturer's warranty that extends to future performance always benefits the end user . . .." Brief of Respondent, at 33. Future performance does not *always* benefit the end user, but Touchet Valley's argument is not as simple as Truss-T suggests. The court in *Schroeder* held that a time-bound warranty against defects in a diesel truck motor protected the current operator, whether or not the operator was the original purchaser. Truss-T points out that a manufacturer's witness in *Schroeder* established that the diesel motor manufacturer intended its warranty to benefit the end user and that the warranty substantially followed one given by the dealer. Truss-T argues that none of the factors in *Schroeder* is present here.

However, Truss-T overlooks *Schroeder's* reasoning which supports Touchet Valley's claim. The court in *Schroeder* stated:

> The engine was warranted to be free of defects "for two years or 100,000 miles or 3,600 hours of *operation*." . . . Obviously, the warranty is for the benefit of the *operator*.

*Schroeder*, at 165. The court in *Schroeder* determined that the purchaser was a third party beneficiary of the manufacturer's warranty because warranty benefits flowed directly to the third party and were not indirect, inconsequential or incidental. The court noted the manufacturer attempted repairs without success. *Schroeder.*

In *Lidstrand*, Truss-T contends, the court specifically emphasized that a manufacturer did not limit a 12-month mobile home warranty to the original purchaser. But the court, by pointing out that omission, merely reinforced its conclusion.

> On its face, a warranty that the home will be defect free for 12 months is a promise there will be no defects during that time, regardless of who happens to own the product. We conclude

that any owner of the mobile home during the 1-year warranty period was intended to benefit from Silvercrest's warranty.

*Lidstrand,* at 363-64. As in *Schroeder,* the court in *Lidstrand* found the end user to be the intended third party beneficiary of a manufacturer's warranty that existed for a set time. The court cited *Schroeder* as a basis for its reasoning. *Lidstrand,* at 363.

Touchet Valley argues convincingly that the 1-year duration for Truss-T's warranty must be read to benefit the owner, necessarily and directly. *Tooley v. Stevenson Co-Ply, Inc.,* 106 Wn.2d 625, 630, 724 P.2d 368 (1986). For all practical purposes, Truss-T's 1-year warranty on its fabricated components would mean little to the contractor/dealer who builds the structure and moves on to the next job. We believe the Court of Appeals in *Schroeder* and *Lidstrand* correctly determined that warranties against product defects extend for a definite time, benefit the end user, and not just the first purchaser. We hold the price book warranty, as well as the quality assurance in Truss-T's purchase order form, benefited Touchet Valley.

Agency. Having ruled that Truss-T's express warranties extended to Touchet Valley as a third party beneficiary, we need not reach the question whether Opp & Seibold extended express warranties as an agent for Truss-T. We hold the trial court erred in dismissing Touchet Valley's warranty claims.

### III
### PRODUCT LIABILITY CLAIMS

Truss-T Structures cross-appeals the trial court's dismissal of its motion for summary judgment. The motion would have dismissed Touchet Valley's tort claim under the Washington product liability act (WPLA). Truss-T Structures argues that Touchet Valley's losses are purely economic and therefore not recoverable under the act. *See* RCW 7.72-.010(6).[4]

---

[4]In defining the types of harm recoverable under the act, RCW 7.72.010(6) provides: " 'Harm' includes any damages recognized by the courts of this state:

The WPLA confines recovery to physical harm of persons and property and leaves economic loss, standing alone, to the Uniform Commercial Code. Talmadge, *Washington's Product Liability Act*, 5 U. Puget Sound L. Rev. 1, 10 (1981-1982). We must then decide whether Touchet Valley's damages constitute more than pure economic loss, unrecoverable under the act.

In *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 774 P.2d 1199, 779 P.2d 697 (1989), this court held that a "risk of harm" analysis is the appropriate test for determining the nature of damages. We explicitly rejected the bright-line approach found in *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986), which held that where damage occurs only to the product itself, such losses are "purely economic" and properly recoverable in contract. However, contrary to Truss-T's assertion, this court left open for another day the issue of whether the "sudden and dangerous" test or a more evaluative approach is the appropriate method for analyzing the risk of harm. *Graybar*, at 867.

A majority of courts that follow the risk of harm approach apply the "sudden and dangerous test", distinguishing economic loss from other damages principally according to the *manner* in which the product failure has occurred. If the failure is the result of a sudden and dangerous event, it is remediable under tort principles. If no such event has occurred, the product failure is deemed economic loss. *Graybar*, at 866. The more "evaluative approach" proceeds on the theory that a product user should not have to suffer a calamitous event before earning his remedy in tort. *Graybar*, at 866-67. This approach examines interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law

---

*Provided,* That the term 'harm' does not include direct or consequential economic loss under Title 62A RCW."

or the expectation-bargain protection policy of contract law is most applicable to the claim in question. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir. 1981).

We do not decide here which approach to characterizing the risk of harm is preferable in this State. While the law is unsettled, this court should not engage in the resolution of issues which arise, but are not briefed by the parties. *John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 785, 819 P.2d 370 (1991). In any event, under either analysis the result is the same here. We hold that Touchet Valley's losses present more than pure economic harm, and therefore affirm the trial court's denial of Truss-T Structures' motion for summary judgment.

A. The "Sudden and Dangerous" Test

The flathouse building at issue here was designed to hold grain to 20 feet on the sidewalls (approximately 1.9 million bushels of grain). When the building was filled to that level, its frame structure was damaged and it began to fall apart. In March 1985, Touchet Valley employees discovered that one of the main frames of the building had buckled at the roof. Attempts to repair the structure failed.

Finally, in October 1985, a 24-foot-wide by 27-foot-high section of the building's wall panel fell to the ground, spilling grain valued at $8,377.64. Various structural members of the building twisted, bent, and pulled loose, irreparably damaging the roof. As a result, moisture, pests, and insects infested and damaged a portion of the grain remaining inside the flathouse building.

While they concede there was a "significant problem" with the building, Truss-T Structures maintains that the building did not collapse. Accordingly, they argue that "there was no realistic threat to people or other property" as a result of the wall panel falling to the ground. Reply Brief of Respondent, at 8-9. We disagree. The flathouse building was inherently unsafe from the time it was filled with

grain. The building was literally coming apart at the seams. A 24- by 27-foot wall panel falling to the ground is certainly a sudden and highly dangerous event, which posed a real, nonspeculative threat to persons and property. Clearly, the risk of harm here was more than economic, and therefore the safety-insurance policies of the WPLA apply.

## B. The "Evaluative Approach"

Under the evaluative approach, this court considers three factors in analyzing the risk of harm: (1) the nature of the defect; (2) the type of risk; and (3) the manner in which the injury arose. *Pennsylvania Glass Sand*, at 1173.

Nature of the Defect. Here, Truss-T Structures argues that Touchet Valley's real complaint is that the building was not of the quality which it expected under the construction contract, and as a result, Touchet Valley has been forced to spend hundreds of thousands of dollars to rebuild it. Brief of Respondent, at 48; Clerk's Papers, at 16-17. They argue the damages sought, while not dispositive, reveal the true nature of plaintiff's claim — that is, their expectations under the contract were not met. Therefore, Truss-T Structures claims the cost of repairing the building and bringing it up to the standards the owner claims it should have met in the first place, indicate the harm here is qualitative or purely economic. In support of this argument, Truss-T Structures cites *Stuart v. Coldwell Banker Comm'l Group, Inc.*, 109 Wn.2d 406, 745 P.2d 1284 (1987).

Contrary to Truss-T's assertion, the facts in this case are distinguishable from those in *Stuart*. While the nature of the defect in that case was that the decks and walkways were not of the quality desired by the buyer, they were safe at the time they were constructed. The only "injury" suffered was that the decks themselves deteriorated, not through accident or violent occurrence, but through exposure over time to weather. *Stuart*, at 421. "Defects of quality are evidenced by internal deterioration, and designated as economic loss, while loss stemming from defects

that cause accidents involving violence or collision with external objects is treated as physical injury." (Citations omitted.) *Stuart*, at 420.

The flathouse building in the present case was unsafe from the time it was constructed, and literally began falling apart when it was filled with grain. Unlike *Stuart*, this case also involves physical injury to something more than just the product itself. The grain stored inside the flathouse building was damaged through exposure to moisture, pests, and insects. Touchet Valley claims the loss amounts to $8,377.63.

Where the nature of a defect is such that the plaintiff has been exposed through a hazardous product, to an unreasonable risk of harm to his person or his property, the safety interests of tort law are present. *Pennsylvania Glass Sand*, at 1169. Therefore, the nature of the defect here implicates the Washington product liability act.

Type of Risk. The risk of structural collapse posed a real, nonspeculative danger of physical injury to any persons walking in or about the flathouse building. It is simply fortuitous that no persons were present when the 24- by 27-foot wall panel detached and fell to the ground. The loss of structural integrity also posed a risk of harm to other property in the vicinity of the building. As previously noted, the grain was subject to exposure to moisture, pests, and insects, and eventually had to be removed from the building to avoid a total loss. These are the type of risks which underlie the safety-insurance concerns of tort law.

Manner in Which Injury Arose. In considering the manner in which the injury arose, the "evaluative approach" could readily incorporate the sudden and dangerous test discussed above. It is difficult to see how the wall panel falling to the ground can be characterized as anything but a sudden and dangerous event. Even without the sudden and dangerous test, it is clear in this case that the injury arose in a tortious manner, rather than through some disappointment of Touchet Valley's expectations under the contract. Unlike the

injury in *Stuart*, which developed slowly over time from continued exposure of the walkways and decks to the elements, the injury here became obvious as soon as the flathouse building was filled with grain. Under the weight and stress of the grain, the building's structural integrity simply began to disintegrate despite repair efforts. The building was inherently unsafe. Using the evaluative approach, it becomes clear that Touchet Valley suffered physical harm to its property and the safety-insurance concerns underlying tort law apply to its claims. Touchet Valley's losses constitute more than pure economic harm.

Whichever approach is used in this case to characterize the nature of Touchet Valley's claims, the result is the same: the WPLA applies. We affirm the trial court's refusal to grant Truss-T Structures' motion for summary judgment on Touchet Valley's tort claims.

## IV
### ATTORNEY'S FEES

■ Opp & Seibold claims attorney's fees under CR 11, arguing that Touchet Valley sued despite the contract's clear and unambiguous subrogation waiver. We deny this request, noting that our decision on the subrogation waiver issue differs from the trial judge's reasoning. Clerk's Papers, at 2358. Touchet Valley's prosecution of its claim hardly meets the frivolity standards of CR 11. *Cf. Watson v. Maier*, 64 Wn. App. 889, 827 P.2d 311 (1992).

### CONCLUSION

1. When parties to a contract intend to insulate each other from liability through a subrogation waiver, the waiver will not be avoided by an insurance company's advancing money to its insured under the guise of a "loan". Such "loan receipts" will not be allowed to defeat a valid subrogation waiver.

2. We affirm the trial court's holding that Opp & Seibold is protected by the subrogation waiver found in the Touchet Valley-Opp & Seibold construction contract to the extent

that Touchet Valley's insurance covers the losses. The trial court also properly granted summary judgment in favor of National Surety, the bonding company that assured Opp & Seibold's performance. We remand, however, for a determination of Touchet Valley's insurance coverage.

3. We hold that Truss-T Structures is not protected from liability by the subrogation waiver clause found in the Touchet Valley-Opp & Seibold construction contract because it is a stranger to that contract. Accordingly we affirm the trial court's denial of Truss-T Structures' motion for summary judgment on that issue.

4. We hold that a third party beneficiary analysis can be used to pursue claims for breach of implied warranties under the Uniform Commercial Code. We hold that Touchet Valley is entitled to the benefit of implied warranties made by Truss-T Structures to Opp & Seibold. Touchet Valley is also entitled to the benefit of express warranties made by Truss-T Structures to Opp & Seibold. Therefore, we reverse the trial court and reinstate Touchet Valley's breach of warranty claims against Truss-T Structures.

5. We hold the WPLA applies because Touchet Valley's losses constitute more than pure economic loss. We affirm the trial court's denial of Truss-T Structures' motion for summary judgment dismissing Touchet Valley's product liability claims under the act.

6. We hold that Touchet Valley's prosecution of this appeal was not frivolous. Accordingly, we deny Opp & Seibold's motion for attorney's fees and sanctions under CR 11.

UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

Reconsideration denied September 14, 1992.