[No. 27275-6-I.    Division One.    August 17, 1992.]

JAMES H. STANTON, ET AL, *Appellants,* v. BAYLINER MARINE
CORPORATION, ET AL, *Respondents.*

ALBANY INSURANCE COMPANY, *Appellant,* v. BAYLINER
MARINE CORPORATION, ET AL, *Respondents.*

`Paul N. Daigle, Dennis A. Ostgard, James P. Murphy,` and *Schwabe, Williamson & Wyatt,* for appellants.

*Dexter A. Washburn, Newell D. Smith,* and *Mikkelborg, Broz, Wells & Fryer; Donald C. Cramer* and *Law Office of Donald C. Cramer; Joseph E. Fischnaller* and *Reaugh Fischnaller & Oettinger,* for respondents.

GROSSE, C.J. — This is an appeal from an order granting partial summary judgment in favor of defendants, Bayliner Marine Corporation (Bayliner) and Olympic Sales, Inc., d.b.a. Olympic Boat Centers (Olympic Boat). The claims of plaintiffs in these consolidated cases arise from separate casualties involving two 45-foot Bayliner model 4550 motor yachts, the *Moonraker* and *Contessa.* The *Moonraker* was owned by James H. Stanton, Winnifred Stanton, and Stanton Investment Company. The *Contessa* was owned by Wiley Dean Henry and Barbara Merlino Henry. Both yachts were insured by Albany Insurance Company (Albany).

The Stantons and the Henrys both bought Bayliner motor yachts from a sales office of the Olympic Boat Centers in Seattle, Washington. The vessels were manufactured by Bay-

liner, were constructed nearly identically, and were designed for recreational use. While the Stantons and the Henrys were pleasure boating, their yachts struck underwater objects: the Stantons' yacht struck a submerged rock in Puget Sound, Washington; the Henrys' yacht grounded on a reef off the coast of Vancouver Island, Canada. As a result of the collisions both boats suffered severe hull damage which caused mass flooding. Specifically, the keels of the vessels, a longitudinal extension of the hull that protrudes most deeply, penetrated on impact allowing seawater to sink the vessels rapidly.[1] The passengers on the Stanton yacht were rescued by nearby boaters; those aboard the Henry yacht were rescued by a Canadian maritime helicopter.

The Stantons and Albany, under its subrogated interest, brought similar suits against Bayliner and Olympic Boat primarily seeking to recover the cost of replacing and repairing the yachts. They presented a declaration of a naval architect and marine engineer who stated that the design of the keel was defective and resulted in the losses for which Stanton and Albany were seeking recovery. The naval architect also stated that certain design techniques could have prevented the mass flooding.

Bayliner sought summary judgment dismissal of the bulk of Stantons' and Albany's claims on the ground that the suits predominantly sought recovery for economic losses (replacing and repairing the vessels) which are not recoverable under maritime law. The trial court granted the motion, dismissing substantially all of Stantons' and Albany's claims. This appeal followed.

Albany contends that the trial court erred in applying federal maritime law, which precludes recovery for economic losses, rather than state law, to claims arising from the grounding of two pleasure boats in navigable waters. Whether the trial court erred turns on two questions: (1)

---

[1] Bayliner asserts that the Stantons' boat sank in 27 minutes. The Stantons maintain it sunk in 12. The Henrys' boat did not sink as it remained lodged on the rocks upon which it had grounded.

whether admiralty jurisdiction is indeed proper here; and (2) if it is, whether admiralty law compels the choice of the federal over the state definition of "economic loss" on these facts. We consider each question in turn.

## JURISDICTION

■ Bayliner contends, and Albany concedes, that admiralty jurisdiction applies. We agree. As a general rule, the application of maritime jurisdiction is appropriate when the event giving rise to the suit occurs on navigable waters, and the potential hazard to maritime commerce arises from an activity that bears a substantial relationship to traditional maritime activity. *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982). The second part of the test is determined by asking whether in a general sense such activity has the potential to affect maritime commerce, not whether it actually did so in the particular case at bar. *Sisson v. Ruby*, 497 U.S. 358, 366-67, 111 L. Ed. 2d 292, 302, 110 S. Ct. 2892 (1990); *Foremost Ins. Co. v. Richardson, supra*.

The first part of the test is met, as the locality of the accidental groundings was upon navigable waters. The second part of the test is slightly more difficult to apply because the relevant case law provides no principled line of demarcation between circumstances that are deemed to carry the potential to disrupt maritime commerce, and thus lie within maritime jurisdiction, and those which do not.

The jurisdictional test is fact specific; not every accident that occurs on navigable waters and has the potential to disrupt maritime commerce will render the application of admiralty jurisdiction appropriate. In *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 34 L. Ed. 2d 454, 93 S. Ct. 493 (1972), for example, the Supreme Court held that the sinking of an aircraft in navigable waters did not support a claim in admiralty, despite the fact that, strictly viewed, the sinking of the aircraft created a potential to disrupt surrounding navigable commerce. In that case, the Court considered that the facts were insufficiently related to

traditional maritime activity to support admiralty jurisdiction.

When the potential hazard to maritime commerce arises from an activity that bears a substantial relationship to traditional maritime activity, however, the application of admiralty jurisdiction is proper even though the suit involves noncommercial vessels. In *Foremost*, the Supreme Court considered whether an accident between two pleasure boats on navigable waters fell within the purview of admiralty jurisdiction. The Court reasoned that the potential impact on maritime commerce when two vessels collide, the need for uniform rules governing navigation, and the uncertainty likely to be occasioned by a jurisdictional test tied to the commercial use of a given boat, rendered the application of admiralty jurisdiction appropriate. Similarly in *Sisson v. Ruby, supra*, the Court held that admiralty jurisdiction existed over a case involving a noncommercial vessel. In that case, a fire erupted in the washer/dryer area of a pleasure yacht while it was docked at a Lake Michigan marina, destroying the yacht, and damaging the marina and neighboring vessels. The Court considered that the requirement of a potential hazard to maritime activity was met because the fire *could have* spread to nearby commercial vessels, or rendered the marina inaccessible to them. The Court also deemed that the storage and maintenance of vessels is sufficiently related to maritime activity to support admiralty jurisdiction.

The facts of this case bear a closer resemblance to those of *Foremost* and *Sisson*, in which the Court held admiralty jurisdiction to be proper, than they do to *Executive Jet*. Insofar as the case involves the grounding of vessels in navigable waters, the requirements that the activity bear a sufficient relationship to maritime activity, and that the events at issue pose a potential hazard to such activity, are met. The case is therefore governed by maritime law. That jurisdictional determination does not by itself however dictate whether federal or state law should govern the defini-

tion of "economic loss". It is to that choice of law question which we now turn.

## CHOICE OF LAW

Although Albany concedes that federal admiralty jurisdiction applies, it maintains that state law should displace federal law because the state has a significant interest in the issues at stake in this case, and because the application of state law would not unduly disturb the uniformity of federal maritime law.[2] It cites *Kossick v. United Fruit Co.*, 365 U.S. 731, 738, 6 L. Ed. 2d 56, 81 S. Ct. 886 (1961) for this proposition. More specifically, Albany maintains that the Washington product liability act (WPLA) applies and that it would provide recovery for the economic losses sustained here. The disposition of this case turns on the definition of "economic loss" in a maritime context. Under federal maritime law, if a product injures only itself, the damages are categorized as "purely economic". Such losses cannot sound in tort; plaintiffs must resort instead to contract law:

> Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain — traditionally the core concern of contract law.

*East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 870, 90 L. Ed. 2d 865, 106 S. Ct. 2295 (1986).

The Washington Supreme Court considered and rejected this construction of "economic loss" in *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 864-66, 774 P.2d 1199, 779 P.2d 697 (1989). There, the court held that for the purpose of the prohibition of RCW 7.72.010(6) against recovering economic losses in a product liability action, whether economic losses are recoverable is determined by applying a "risk of harm" analysis rather than by assessing damages actually sustained. *Graybar*, 112 Wn.2d

---

[2]Albany also maintains that it should recover under a Uniform Commercial Code warranty theory. The incomplete state of the record, however, does not permit us to pass on that assertion.

at 865.[3] The court's approach, although stopping short of identifying which of several versions of risk of harm analysis it prefers (see *Graybar*, 112 Wn.2d at 866-67), requires us to evaluate such factors as the nature of the product defect, the type of risk posed by that defect, and the manner in which the injury occurred. *Graybar*, 112 Wn.2d at 866-67. *See also Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Constr., Inc.*, 119 Wn.2d 334, 352-55, 831 P.2d 724 (1992).

■ Traditionally, admiralty suits are governed by federal law. *See generally Southern Pac. Co. v. Jensen*, 244 U.S. 205, 216, 61 L. Ed. 1086, 37 S. Ct. 524 (1917). The United States Supreme Court has recognized however that even where admiralty jurisdiction lies, state law may nevertheless displace federal law when a matter of local concern is at stake and the application of state law would not unduly disturb the uniformity of the maritime legal system. *See Kossick v. United Fruit Co.*, 365 U.S. at 738 (citing *Western Fuel Co. v. Garcia*, 257 U.S. 233, 242, 66 L. Ed. 210, 42 S. Ct. 89 (1921); and *Southern Pac. Co. v. Jensen, supra*). *See also Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1422 (9th Cir. 1990), *cert. denied*, ___ U.S. ___, 119 L. Ed. 2d 578, 112 S. Ct. 2956 (1992).

The United States Supreme Court has explicitly rejected the notion that "wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant." *Kossick*, 365 U.S. at 739. The Court explained:

[T]he process is surely rather one of accommodation, entirely familiar in many areas of overlapping state and federal con-

---

[3]In *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992), the court further refined this concept by explaining that although pure economic loss is recoverable only under the Uniform Commercial Code, the nature of the loss sustained is determined by a risk of harm analysis. The court however again declined to decide which approach to characterizing economic harm should apply. *See Touchet*, 119 Wn.2d at 352. As was true in that case, regardless of the definition of risk of harm applied, summary judgment is inappropriate on the facts alleged here, namely a product defect creating the risk of rapid sinking upon impact.

cern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern. Surely the claim of federal supremacy is adequately served by the availability of a federal forum in the first instance and of review in this Court to provide assurance that the federal interest is correctly assessed and accorded due weight.

*Kossick*, 365 U.S. at 739 (citing with approval the application of state wrongful death statutes, *The Tungus v. Skovgaard*, 358 U.S. 588, 3 L. Ed. 2d 524, 79 S. Ct. 503 (1959); *The Hamilton*, 207 U.S. 398, 52 L. Ed. 264, 28 S. Ct. 133 (1907), and state survival of actions statutes, *Just v. Chambers*, 312 U.S. 383, 668, 85 L. Ed. 903, 61 S. Ct. 687 (1941), although the wrongs alleged were committed within admiralty jurisdiction and were defined by admiralty law).

In deciding whether to apply federal admiralty or state law to the definition of "economic loss" we engage in interest analysis, a process in which we weigh the respective state and federal interests implicated in the suit and apply the body of law in which most of those interests reside. *See Kossick*, 365 U.S. at 738-42. When the state interests in a matter outweigh federal maritime interests, a court is said to apply "maritime and local" laws. *See Kossick*, 365 U.S. at 738.

■ Interest analysis leads us to conclude that Washington's definition of "economic loss" should apply. Whatever federal interest in uniformity exists, it is outweighed by Washington's concern to ensure the personal safety of its citizens, to deter the manufacture and dissemination of dangerous products, and to exercise its authority over tortfeasors acting within its jurisdiction. The WPLA, whose very application is at issue in this case, itself attests to those interests. *See generally* RCW 7.72. The Washington Supreme Court gave expression to those concerns when it rejected the *East River* approach to defining "economic loss":

> The Court's analysis in *East River*, we believe, unjustifiably dismisses the safety concerns attendant to product injuries caused by hazardous defects. For this reason, we find *East River*'s approach to economic loss unsuited to what the Legislature intended under the WPLA. . . .

In contrast to the *East River* approach, risk of harm analysis appropriately accommodates the safety and risk-spreading policies that underlie the law of product liability, and "provides a workable and accurate distinction between accidents that should be actionable in tort and losses that should remain in the domain of warranty law." Comment, *Asbestos in Schools and the Economic Loss Doctrine*, 54 U. Chi. L. Rev. 277, 300 (1987). Under this analysis, the fact that a hazardous product defect has injured only the product itself, and not persons or other property, is properly regarded as a "pure fortuity". *Consumers Power Co. v. Curtiss-Wright Corp.*, 780 F.2d 1093, 1099 (3d Cir. 1986). Thus, the same remedy is made available for this sort of injury as would be available if the product defect had injured something or someone else.

*Graybar*, 112 Wn.2d at 864-66.

█ In view of *Graybar*'s explicit and unequivocal rejection of the *East River* approach, and the amply articulated rationale underlying that rejection, *see Graybar*, 112 Wn.2d at 863-66, we are constrained to conclude that Washington has a significant interest in a divergent interpretation of "economic loss". Because a significant state interest is at stake, and because its application would not unduly disrupt the uniformity of federal admiralty law, federal admiralty law permits us to apply state law. We therefore apply the *Graybar* definition of "economic loss" to Stantons' and Albany's claims. Because Stanton and Albany produced evidence to support the contention that their economic losses resulted from a product defect that posed a risk of harm, the trial court erred in dismissing their claims, which may properly be heard under the WPLA.

█ Not argued by the parties but equally dispositive is the following reasoning: Under admiralty law, "economic loss" claims must sound in contract or not at all. *See East River*, 476 U.S. at 870. The substantive contract law which applies to the claims asserted here is Washington's. Washington's product liability act (RCW 7.72) creates a single cause of action for product-related harms that preempts previously existing common law product liability remedies. *See* RCW 7.72.010(4) and *Graybar*, 112 Wn.2d at 853-54. Under the product liability statute, "economic loss" is determined by a risk of harm analysis. *See Graybar*, 112 Wn.2d at

860 (citing *Stuart v. Coldwell Banker Comm'l Group, Inc.*, 109 Wn.2d 406, 417-22, 745 P.2d 1284 (1987)). Thus, even applying admiralty law to the claims herein would require reversal.

The judgment of the trial court is reversed and the case remanded.

BAKER and AGID, JJ., concur.

Reconsideration denied November 30, 1992.

Review granted at 121 Wn.2d 1007 (1993).