CAESAR ELECTRONICS INC.,
Plaintiff–Appellant,

v.

Paul R. ANDREWS, Director, United States Customs Service; Fairchild Semiconductor Corporation; Schlumberger Technologies, Inc., Defendants–Appellees.

No. 88–15789.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 18, 1990.

Decided June 7, 1990.

Dean Francis Pace and Wm. John Kennedy, Pace and Kennedy, Los Angeles, Cal., for plaintiff-appellant.

James A. Bruen, Richard C. Coffin, and Cydney T. Batchelor, Landels, Ripley & Diamond, Sanford Svetcov, San Francisco, Cal., for defendants-appellees.

Before HUG, SKOPIL, and SCHROEDER, Circuit Judges.

SKOPIL, Circuit Judge:

In this case we are asked to determine whether under California law a party who cooperates with the government in a criminal investigation is immune from subsequent civil liability in an action brought by the party investigated. We conclude that the cooperating party here is immune under California law from civil liability. We affirm.

FACTS AND PRIOR PROCEEDINGS

In 1983 Fairchild Camera and Instrument

Corporation ("Fairchild")[1] manufactured the Sentry Series 20 LSI/VLSI Test System ("System"), computer hardware used for testing semiconductor chips. Because the System could have been diverted to unfriendly governments and used for military purposes, the United States Department of Commerce classified it at the highest level and placed the System on its Commodity Control List, thereby strictly regulating its availability for export.

In the fall of that year Caesar Electronics, Inc. ("Caesar") placed an order with Fairchild for the System. In doing so, Caesar purportedly was acting as broker and exporter for the French firm of Development Engineering and Electronics, Ltd. ("DEE"), which in turn had allegedly received the order from a division of another French company, C.S.F. Thomson ("CSFT").

Although the paperwork appeared to be in order, Fairchild's suspicions were aroused. Among other things, Caesar was not one of Fairchild's established customers; the order could have been routed through Fairchild's French affiliate, Enertec, S.A. ("Enertec"); and the ultimate purchaser was not interested in receiving any training or service for the System. A check revealed that CSFT had placed no such order with DEE.

Fairchild contacted the United States Customs Service ("Customs") and reported its concerns. Customs instructed Fairchild to proceed with the transaction, to cooperate with the government in its investigation of Caesar, DEE, and DEE's president, Rudolphe Agnese ("Agnese"), and to keep the investigation confidential, i.e., Fairchild was not to say anything about it to Caesar. Concerned that its actions might lead to civil or criminal liability, Fairchild sought and obtained letters from the United States Departments of Justice and Commerce confirming that Fairchild was acting with the knowledge and consent of those departments and would not be subject to any liability for possible violations of American

export laws as the result of its cooperation in the investigation.

With these assurances, Fairchild granted the investigators access to its facilities, including permission for them to monitor and record telephone conversations with Caesar's vice-president, Warren Thompson ("Thompson") and Agnese, and made false statements (at the government's request) to Thompson as part of maintaining a "cover story."

To strengthen their case against DEE and Caesar, the investigators instructed Fairchild to manufacture a dummy facsimile System (in addition to a functioning System) for eventual shipment to France. Because of concerns that it might not be compensated, Fairchild arranged for a letter of credit in the amount of $966,251 ($762,240 to Fairchild as the purchase price of the System and $204,011 to Caesar as its broker's fee) to be opened at a Swiss bank by the purported purchaser of the System. The Swiss bank was instructed to transfer the above sums to Fairchild and Caesar upon presentation of documents certifying that shipment of the System had been made. Fairchild then obtained authorization from Caesar to act as Caesar's agent in the preparation of these documents. Fairchild prepared the necessary papers to comport with Caesar's export license, i.e., listing CSFT as the ultimate purchaser and France as the final destination.

On May 3, 1984 government officials in Los Angeles substituted the dummy System for a real one immediately prior to its shipment to France. Upon the dummy System's arrival in France, the Swiss bank wired the above sums to Fairchild and Caesar, respectively. On May 11, 1984 French customs agents seized the dummy System at the Swiss border when an attempt was made to divert it into Switzerland.

Thompson, Agnese, and DEE were indicted in federal district court on eight felony counts for, inter alia, conspiring to violate American export laws. Thompson pleaded guilty to one count of the indictment and was sentenced to three years in

---

1. Fairchild Camera and Instrument Corporation changed its name to Fairchild Semiconductor Corporation in December 1985 and is now a division of Schlumberger Technologies, Inc.

prison (suspended), three years on probation, 360 hours of community service, and fined $2,500. Agnese was convicted by a French court of violating French customs laws. In addition, the Department of Commerce administratively charged Caesar with two counts of violating American export laws.

On February 2, 1987 Caesar filed the instant diversity action in federal district court against Fairchild, alleging fraud and breach of fiduciary duty and seeking some $40,000,000 in damages as well as rescission of the contract. On September 22, 1988 the district court granted Fairchild's motion for summary judgment, holding that California law immunized Fairchild from civil liability for its cooperation with the government in the investigation. Caesar subsequently filed a motion to reconsider, which was denied. A timely notice of appeal was filed twelve days later.[2]

## DISCUSSION

Caesar's argument may be summarized by the following syllogism: (1) an agent's fiduciary obligation to disclose all pertinent confidential information to its principal is the "highest duty known to law"; (2) Fairchild was at all relevant times acting as Caesar's agent; (3) by withholding from its principal the confidential information that Caesar was the target of a federal criminal investigation, Fairchild violated its fiduciary obligation to its principal. This argument is meritless.

■ First, the major premise is patently false and finds no support in the law. However high the duty an agent may owe

its principal, society's interest in preventing the commission of criminal acts overrides that duty, as exemplified by the wealth of state and federal criminal conspiracy statutes in this country. *See also Restatement (Second) of Agency* § 411, comment b (1958) (agent's duty to principal does not extend to committing illegal acts at principal's request). *Cf., United States v. Laurins,* 857 F.2d 529, 540–41 (9th Cir.1988) (attorney-client privilege does not extend to furtherance of crime), *cert. denied,* —— U.S. ——, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989).

■ Second, the minor premise is a misrepresentation of the undisputed facts. Our examination of the record shows that the only time Fairchild expressly acted as Caesar's agent was when Caesar authorized Fairchild to prepare and submit the documents necessary for the System's movement from the United States to France and the parties' receipt of payment therefor. Caesar's efforts to bootstrap this limited agency relationship into an argument that its position vis-a-vis Fairchild was from beginning to end one of principal-agent is not supported by the record.

■ Third, the conclusion is invalid because it is unsupported by the law. Under California law, which governs in this case,[3] citizens are generally immune from civil liability for their good faith cooperation with the government in its criminal investigations. *See, e.g., Sokol v. Public Utils. Comm'n,* 65 Cal.2d 247, 257–58, 418 P.2d 265, 272, 53 Cal.Rptr. 673, 680 (1966) (private utility not liable for damages as result of disconnecting plaintiff's telephone upon

**2.** On October 27, 1988 the district court also granted the remaining defendants' motion to dismiss with prejudice. Although Caesar appealed from that ruling, the appeal was abandoned. A related appeal on Caesar's motion to intervene in the government's forfeiture action involving the System was dismissed.

**3.** While conceding that California law applies, Caesar makes a confusing argument about the district court's allegedly erroneous interpretation of the *Erie* doctrine with respect to the burden of proof where summary judgment is concerned, then proceeds to argue that the lower court should have applied the holding of

*Angel v. Seattle–First Nat'l Bank,* 653 F.2d 1293 (9th Cir.1981), to the facts of this case. These contentions merit little attention. First, under the *Erie* doctrine, federal law governs the procedural aspects of summary judgment in a diversity case, while the law of the forum controls the substantive issues. *See Sullivan v. Massachusetts Mut. Life Ins. Co.,* 611 F.2d 261, 263–64 (9th Cir.1979) (per curiam). The district court did not err on this point. As for the contention that *Angel* should control here, we note that that case is both factually irrelevant and legally inapposite, involving as it does the interpretation of, *inter alia,* Washington commercial law and not California law. *See Angel,* 653 F.2d at 1297.

receiving information that plaintiff was using telephone for illegal purposes); *Peterson v. Robison*, 43 Cal.2d 690, 697, 277 P.2d 19, 24 (1954) (private citizen immune from civil damages for false arrest claim resulting from citizen's arrest of plaintiff at request of peace officer).

We recently applied and extended this rule of California law. *See Forro Precision, Inc. v. IBM Corp.*, 673 F.2d 1045 (9th Cir.1982) (*"Forro I"*). In that case, IBM was sued in federal court by a competitor as the result of IBM's cooperation with Santa Clara police officers in their criminal investigation of that competitor. In reversing the district court's judgment in favor of the plaintiff, we stated:

> Our examination of the evidence adduced in this case and applicable California law leads us to conclude that the Supreme Court of California would hold that IBM's actions in assisting the police in making the search were privileged and could not serve as a basis for civil liability.

*Id.* at 1053. We cited with approval both *Peterson* and *Sokol. Id.* at 1054. Following our remand, IBM moved for summary judgment based in part on this grant of immunity. The district court agreed and granted the motion, which we affirmed on appeal. *See Forro Precision, Inc. v. IBM*, 745 F.2d 1283, 1286 (9th Cir.1984) (*"Forro II"*), *cert. denied*, 471 U.S. 1130, 105 S.Ct. 2664, 86 L.Ed.2d 280 (1985).

Caesar attempts to distinguish our *Forro* decisions by arguing that Fairchild's act of approaching Customs deprives it of the benefit of immunity. This is a meritless argument. The noncontroverted materials in the record reveal that Fairchild would not have gone forward with the sale but for the request by Customs that it do so, and even then Fairchild proceeded with the transaction only upon receiving the government's written assurance that Fairchild's

assistance was both legal and necessary to the investigation.[4]

Our conclusion that Fairchild is shielded from civil liability is also supported by the language set out in California Civil Code § 47(2), which states, in relevant part, that "[a] privileged publication ... is one made ... [i]n any ... official proceeding authorized by law." The Supreme Court of California has held that this statutory privilege applies to virtually all causes of action except malicious prosecution. *Ribas v. Clark*, 38 Cal.3d 355, 364, 696 P.2d 637, 643, 212 Cal.Rptr. 143, 149 (1985). *See also Forro I*, 673 F.2d at 1055 ("California courts have invoked the policies underlying the privilege to defeat liability for interference with business relations and related torts.").

Finally, Caesar argues that summary judgment was inappropriate because genuine issues of material fact exist with respect to whether (1) Caesar purchased, rather than merely acted as broker for, the System; (2) Fairchild acted as Caesar's agent in preparing the shipping documents; and (3) Caesar knew what use the government intended for the dummy System. Aside from the fact that these arguments are somewhat disingenuous, Caesar having conceded below that the case was ripe for summary judgment, these contentions have no bearing on the central issue of this case, *viz.*, whether Fairchild was entitled to immunity from civil liability. Fairchild properly supported its motion for summary judgment, and Caesar failed to proffer any directly countervailing documentation with respect to that central issue. We therefore hold that the district court did not err by entering summary judgment in favor of Fairchild. *See* Fed.R.Civ.P. 56(c), (e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468

4. Furthermore, while it is not absolutely clear that Fairchild was required by law to report its suspicions to the Office of Export Administration Control, *see* 50 U.S.C.App. § 2410(b) (1982) and 15 C.F.R. § 787.14(a) & (b) (1989), the potentially large fines and quasi-criminal administrative proceedings to which it could have been subjected for not reporting such concerns indicate that the only prudent course open to Fairchild was to comply with the reporting regulations. *See e.g.*, 50 U.S.C.App. § 2410 (1982) and 15 C.F.R. § 787.1(a) & (b) (1989).

(9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 699, 98 L.Ed.2d 650 (1988).

AFFIRMED.