**Brad CASPER and Sannette Casper, husband and wife, Plaintiffs,**

**v.**

**E.I. DU PONT DE NEMOURS AND CO., a foreign corporation, and PureGro Company, a foreign corporation, Defendants.**

**No. CS–91–319–FVS.**

United States District Court, E.D. Washington.

Nov. 2, 1992.

Brian J. Iller, Raekes Rettig Osborne Forgette & O'Donnell, Kennewick, Wash., for plaintiffs.

Andrew C. Bohrnsen, Lukins & Annis, Spokane, Wash., for E.I. Du Pont De Nemours & Co.

Lucinda S. Whaley, Winston & Cashatt, Spokane, Wash., for Puregro Co.

## ORDER RE MOTIONS TO DISMISS

VAN SICKLE, District Judge.

THIS MATTER came before the Court on October 21, 1992, for argument of separate motions to dismiss brought by defendants Du Pont and Puregro. This order is

intended to memorialize the Court's prior rulings.

Defendant Du Pont is represented by Andrew C. Bohrnsen and Jerry J. Moberg; defendant Puregro is represented by Lucinda S. Whaley and Mary Ellen Gaffney–Brown. The plaintiffs are represented by Brian J. Iller.

For the reasons set forth below, Du Pont's motion is *granted,* and Puregro's motion is *denied* with respect to those claims which allege breach of either an express warranty or an implied warranty of fitness for a particular purpose.

## I.

Du Pont manufactures a herbicide known as "Velpar." (Defendant PureGro's LR 56 Statement of Material Facts (Ct.Rec. 18), at 2.) During December of 1990, PureGro employees applied Velpar to the plaintiffs' alfalfa fields. *Id.* By March of 1991, other alfalfa fields in the area had begun to turn green. However, those of the plaintiffs' fields which had been treated with Velpar in December were still brown. Upon closer examination, plaintiff Brad Casper discovered that alfalfa plants in the treated fields had sustained serious injury. (Affidavit of Brian J. Iller in Opposition (Ct.Rec. 25), Exhibit 1 at 111 (Casper Deposition).)

The plaintiffs filed suit against both Du Pont and PureGro in Franklin County (Washington) Superior Court. The action was removed to federal court based upon diversity of citizenship. 28 U.S.C. § 1332(a). Neither jurisdiction nor venue are disputed.

## II.

Du Pont moves to dismiss those of the plaintiffs' claims which allege failure to warn and inadequate labeling, arguing that state tort claims which are based upon such theories are preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y (1991). (Defendant Du Pont's Motion to Dismiss (Ct.Rec. 12).)

## A.

The Supremacy Clause provides "that the laws of the United States 'shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" U.S. Const. Art. VI, cl. 2. *See Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). As a result, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." *Wisconsin Public Intervenor v. Mortier,* —— U.S. ——, ——, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

However, in considering issues arising under the Supremacy Clause, it is presumed that " 'the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Thus, the question of preemption necessarily turns upon congressional intent. *Mortier,* —— U.S. at ——, 111 S.Ct. at 2481.

There are three circumstances in which state law is preempted under the Supremacy Clause. *English v. General Elec. Co.,* 496 U.S. 72, 78–80, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). In the first instance, a federal statute may contain a provision which explicitly supplants state authority. *Mortier,* —— U.S. at ——, 111 S.Ct. at 2481. Absent such language, state law may be preempted when it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English,* 496 U.S. at 79, 110 S.Ct. at 2275. Finally, preemption "may occur to the extent that state and federal law actually conflict." *Mortier,* —— U.S. at ——, 111 S.Ct. at 2482.

## B.

Congress enacted FIFRA in 1947. In its original form, FIFRA served primarily as a

licensing and labeling statute. *Mortier,* — U.S. at ——, 111 S.Ct. at 2479 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 991, 104 S.Ct. 2862, 2866, 81 L.Ed.2d 815 (1984)). However, as a result of amendments passed in 1972, it was transformed into a comprehensive regulatory statute governing the use, sale, and labeling of pesticides. *Mortier,* — U.S. at ——, 111 S.Ct. at 2479–80.

■ Notwithstanding FIFRA's comprehensive nature, neither its text nor the scope of its regulatory scheme evidence an intent to exclude all state regulation of pesticides. *Mortier,* — U.S. at ——, 111 S.Ct. at 2486. To the contrary, FIFRA provides that:

> A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

7 U.S.C. § 136v(a) (1991).

It is important to note that § 136v(a) does not "serve to hand back to the States powers that the statute had impliedly usurped. Rather, it acts to ensure that the States [can] continue to regulate use and sales even where, such as with regard to the banning of mislabeled products, a narrow preemptive overlap might occur." *Mortier,* — U.S. at ——, 111 S.Ct. at 2486.

Even though a state may participate in the regulatory process, its authority is subject to an important qualification. In the event a state chooses to promulgate pesticide regulations:

> Such state shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C. § 136v(b) (1991).

That limitation reflects the fact that, historically, FIFRA has focused on the labeling of pesticides. *Mortier,* — U.S. at ——, 111 S.Ct. at 2486 (citing *Monsanto,* 467 U.S. at 991, 104 S.Ct. at 2867). The 1972 amendments were enacted "to strengthen existing labeling requirements and [to] insure that these requirements were followed in practice." — U.S. at ——, 111 S.Ct. at 2486 (citations omitted).

### C.

■ To resolve Du Pont's motion, the Court must first decide whether § 136v(b) explicitly preempts those state tort claims which allege failure to warn and inadequate labeling. In that regard, *Cipollone v. Liggett Group, Inc., supra,* is instructive.

In 1983, Rose Cipollone and her husband sued certain cigarette companies alleging that Mrs. Cipollone had developed lung cancer from smoking cigarettes manufactured and sold by the defendant companies. — U.S. at —— – ——, 112 S.Ct. at 2613–14. The cigarette manufacturers argued "that the Federal Cigarette Labeling and Advertising Act, enacted in 1965, and its successor, the Public Health Cigarette Smoking Act of 1969, protected them from any liability based on their conduct after 1965." — U.S. at ——, 112 S.Ct. at 2614.

The Supreme Court first considered the scope of the 1965 Act, and ruled that it did not preempt "state law damages actions." — U.S. at ——, 112 S.Ct. at 2619. It then turned to § 5(b) of the 1969 Act, which provides:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

*Cipollone,* — U.S. at ——, 112 S.Ct. at 2617.

With respect to that provision, the *Cipollone* plaintiffs argued that § 5(b) does not pre-empt common law actions because such actions "do not impose 'requirement[s] or prohibition[s].'" — U.S. at ——, 112 S.Ct. at 2620. The Supreme Court disagreed. It said, "The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." — U.S. at ——, 112 S.Ct. at 2620.

In reaching that conclusion, the Supreme Court recognized that "common law damages actions of the sort raised by [the *Cipollone* plaintiffs] are premised on the existence of a legal duty...." — U.S. at ——, 112 S.Ct. at 2620. That being the case, the Court found it "difficult to say that such actions do not impose 'requirements or prohibitions.'" — U.S. at ——, 112 S.Ct. at 2620 (citation omitted).

Like § 5(b), 7 U.S.C. § 136v(b) forbids imposition of "any *requirements* for labeling or packaging in addition to or different from those required under [FIFRA]." (Emphasis added.) Since "it is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*," — U.S. at ——, 112 S.Ct. at 2620 (emphasis in original), § 136v(b) necessarily comprehends common law duties arising under state law.[1]

Not all common law claims are preempted, however. Section 136v(b) must be construed narrowly, keeping in mind the strong presumption against preemption. *See Cipollone*, — U.S. at ——, 112 S.Ct. at 2621. Thus, the "central inquiry" is whether "the legal duty that is the predicate of the common law damages action," *see* — U.S. at ——, 112 S.Ct. at 2621, constitutes a requirement for labeling or packaging which is either "in addition to" or "different from" those required by FIFRA.

### D.

■ Before a pesticide may be sold or used, it must be registered with the Environmental Protection Agency ("EPA"). 7 U.S.C. § 136a(a) (1991). *See Chemical Specialties Manufacturers Assoc., Inc. v. Allenby*, 958 F.2d 941, 944 (9th Cir.1992). With certain exceptions, a pesticide may not be sold "unless the EPA first determines that the product's labeling contains warnings and directions for use that are 'adequate to protect the public from fraud and from personal injury and to prevent unreasonable adverse effects on the environment.'" 958 F.2d at 944 (citations omitted). Moreover, "[o]nce the EPA has registered a pesticide and approved its label, the manufacturer may not change the label without the EPA's prior approval." 958 F.2d at 944.

■ The plaintiffs do not allege that Du Pont's Velpar label violates EPA requirements. Instead, they argue that the label fails to provide a warning adequate to satisfy a more stringent duty of care arising under state common law.[2] It follows, therefore, that the duty upon which Du Pont's liability is predicated is a requirement which is "in addition to" those imposed by FIFRA. Consequently, the plaintiffs' claims alleging failure to warn and inadequate labeling are expressly preempted by 7 U.S.C. § 136v(b).[3]

### III.

PureGro moves for partial summary judgment. It seeks an order dismissing those claims which allege misrepresentation, violation of Washington's Consumer Protection Act, and breach of either an express warranty or an implied warranty of fitness for a particular purpose. (Defendant PureGro's Motion for Partial Sum-

---

**1.** In *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1541 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), the D.C. Circuit held that a verdict awarding damages "is not equivalent to a direct regulatory command" within the meaning of § 136v(b). That view appears to have been rejected in *Cipollone.* According to the Supreme Court, state "'regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" — U.S. at ——, 112 S.Ct. at 2620 (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959)).

**2.** The plaintiffs have not set forth the elements of the state common law duty which Du Pont is alleged to have violated.

**3.** That being the case, it is unnecessary to consider whether Congress has occupied the field with "the intent to supplant state law or whether state law actually conflicts with federal law...." *Cipollone,* — U.S. at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring).

mary Judgment (Ct.Rec. 16).) [4]

### A.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

A disputed fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, a dispute regarding a material fact raises a genuine issue for trial only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248, 112 S.Ct. at 2510.

As the moving party, it is PureGro which must establish that there is no genuine issue as to any material fact. *Id.*, 477 U.S. at 255–57, 112 S.Ct. at 2514. In determining whether PureGro has met that burden, the " 'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

### B.

An express warranty is "(1) '[a]ny affirmation of fact or promise', (2) '[a]ny description' or (3) '[a]ny sample or model' by a seller relating to or describing the goods, when such representation forms the 'basis of the bargain'. RCW 62A.2–313(1)(a)–(c)." *Touchet Valley v. Opp & Seibold Constr.*, 119 Wash.2d 334, 348, 831 P.2d 724 (1992). Here, the question is whether PureGro fieldman Glen Warr made affirmations of fact regarding the application of Velpar to the plaintiffs' alfalfa fields which became a part of the basis of the bargain.

The record reflects that Glen Warr was employed by PureGro at one time. (Affidavit of David C. Maiden (Ct.Rec. 21), at 2.) During the summer of 1990, Mr. Warr persuaded Brad Casper to switch to PureGro. (Deposition of Glen Warr, at 5.) [6]

A few months later, Mr. Warr and Mr. Casper had a series of conversations regarding the desirability of treating Mr. Casper's alfalfa fields with Velpar. (Deposition of Glen Warr, at 11.) [7] Mr. Warr thought that Velpar was an appropriate means to control weeds in Mr. Casper's fields. *Id.*

Mr. Warr concedes that Mr. Casper questioned the efficacy of applying Velpar during November or December of 1990. *Id.* at 12. Because of Mr. Casper's concerns, Mr. Warr told him that he would speak to a colleague about the matter. *Id.* at 11–12. Apparently, Mr. Warr did. *Id.* at 13.

With respect to their last conversation before the fields were treated, Brad Casper recalls telling Mr. Warr that he was hesitant to apply Velpar to his alfalfa fields before spring. (Deposition of Bradley A. Casper, at 89.) [8] According to Casper, Mr. Warr responded by indicating he had discussed the matter with PureGro and Du Pont representatives, and they saw no problem putting Velpar on the fields during the fall. *Id.* The conversation ended upon

---

**4.** During the hearing on PureGro's motion, the plaintiffs agreed that their misrepresentation and consumer protection claims should be dismissed.

**5.** "[U]nder the *Erie* doctrine, federal law governs the procedural aspects of summary judgment in a diversity case, while the law of the forum controls the substantive issues." *Caesar Electronics, Inc. v. Andrews*, 905 F.2d 287, 289 n. 3 (9th Cir.1990).

**6.** (Affidavit of Mary Ellen Gaffney–Brown (Ct. Rec. 29), Exhibit 1.)

**7.** (Affidavit of Brian J. Iller (Ct.Rec. 25), Exhibit 2.)

**8.** (Affidavit of Brian J. Iller (Ct.Rec. 25), Exhibit 1.)

an uncertain note. Mr. Casper remembers saying, "[Y]ou do what's best for me. I disagree with the fall because it just sounds too fishy to me...." *Id.* at 90.

■ If, in fact, Mr. Warr assured Brad Casper that Velpar could be applied safely during November or December of 1990, and Mr. Casper relied [9] upon that affirmation of fact in deciding to have PureGro treat his fields, an express warranty was created. RCW 62A.2–313. *See Touchet Valley,* 119 Wash.2d at 348, 831 P.2d 724. Thus, a dispute regarding the existence of such an affirmation is material to this action.

Moreover, a reasonable jury could infer from the foregoing that Brad Casper was reluctant to have PureGro apply Velpar to his alfalfa fields prior to springtime without some assurance that it was safe to do so, and that Glen Warr discussed the matter with his colleagues and advised Mr. Casper that a fall application was appropriate. Given Mr. Casper's undisputed hesitation, a jury could infer that he would not have authorized Velpar treatment were it not for Mr. Warr's representations. Consequently, there is evidence sufficient to permit a reasonable jury to find that an express warranty was created.[10]

## C.

■ In Washington, there "are two prerequisites to [an] implied warranty of fitness." *Dobias v. Western Farmers Assoc.,* 6 Wash.App. 194, 199, 491 P.2d 1346 (1971). "First, a buyer must make known to the seller expressly or by implication the particular purpose for which the article is required, and secondly, the buyer must rely on the seller's skill and judgment when he purchased the article." *Id.*

An implied warranty will not arise under RCW 62A.2–315, however, if the buyer relies "on his own skill or judgment rather than the seller's." 2 W. Hawkland, *Uniform Commercial Code Series* § 2–313:05, p. 437–38 (1992). *See Arrow Transp. Co. v. A.O. Smith Co.,* 75 Wash.2d 843, 850, 454 P.2d 387 (1969) (pre-Code). As a corollary, a buyer "cannot shut his eyes to important evidence that an article is unfit for his purpose and thereafter recover damages for losses caused by the same defect." 75 Wash.2d at 850, 454 P.2d 387.

PureGro seeks to invoke this exception by arguing that, as "a sophisticated independent agri-businessman who was familiar with the use of chemicals in his farming operation," Brad Casper could not have relied upon Glen Warr's representations regarding Velpar. (PureGro's Reply Memorandum (Ct.Rec. 28), at 4–5.) In support of its argument, PureGro points out that Casper is an experienced farmer, that he "held a license as a private [pesticide] applicator," and that he had previously used herbicides with the same active ingredient as Velpar. *Id.* at 3.

■ Even assuming the truth of the facts recited by PureGro, the Court cannot say, as a matter of law, that Brad Casper's knowledge of Velpar-like herbicides was so extensive that it necessarily defeats his allegation of reliance. If anything, Mr. Casper's prior experience made him reluctant to apply Velpar during the fall. The plaintiffs' have made a substantial showing that Casper agreed to do so only after receiving assurances of safety from Glen Warr. Thus, a genuine issue of material

9. Although no Washington appellate court has held that buyer reliance is necessary to establish an express warranty, some commentators have suggested as much. *See, e.g.,* 2 W. Hawkland, *Uniform Commercial Code Series* § 2–313:05, p. 437–38 (1992) (but noting that buyer's "burden is satisfied if the buyer shows that affirmations ... were made by the seller and ... buyer bought the goods. At that point it is assumed that the buyer bought the goods at least in partial reliance on those affirmation ..., and the burden then shifts to the seller....") There is some indication, however, that the Washington Supreme Court will follow the commentators' approach to the question of reliance. In *Touchet Valley v. Opp & Seibold Constr.,* 119 Wash.2d 334, 347, 831 P.2d 724 (1992), the Court said, "Recovery for breach of an express warranty is contingent on a plaintiff's knowledge of the representation."

10. The fact that a genuine issue exists does not necessarily mean the plaintiffs are correct in asserting that PureGro warranted that fall was the best time (or the safest time) to apply Velpar.

fact exists with respect to the creation of an implied warranty of fitness for a particular purpose.[11]

IT IS HEREBY ORDERED:

1. Du Pont's motion to dismiss (Ct.Rec. 12) is granted with respect to those of the plaintiffs' claims which allege failure to warn and inadequate labeling.

2. PureGro's motion for partial summary judgment (Ct.Rec. 16) is granted with respect to the plaintiffs' misrepresentation and consumer protection claims, and denied with respect to the plaintiffs' warranty claims.

IT IS SO ORDERED.

---

11. PureGro's argument overlooks an insightful observation made by the drafters of the Uniform Commercial Code. Namely, that "[w]hether or not [an implied warranty of fitness for a particular purpose] arises in ... an individual case is basically a question of fact to be determined by the circumstances of the contracting." Official Comment 1, RCW 62A.2–315.