[No. 62324-4. En Banc. June 15, 1995.]

OLIVER ED HUE, ET AL., *Appellants,* v. FARMBOY
SPRAY CO., INC., ET AL., *Respondents.*

68

*John S. Moore, J. Jay Carroll,* and *Velikanje, Moore & Shore, Inc.,* for appellants.

*Holly A. Hollenbeck,* for respondent Farmboy Spray Co.

*Susan K. Harrel* and *Lathrop, Winbauer, Harrel & Slothower (Raymond Ripple,* of counsel), for respondent DuPont.

*Andrew C. Bohrnsen (*of *Lukins & Annis, P.S.),* for respondents Wheat Growers.

*Walter G. Meyer (of Meyer, Fluegge & Tenney, P.S.),* for respondent Moore, et al.

*Francois X. Forgette (of Rettig, Osborne, Forgette, O'Donnell & Iller),* for respondent Hamilton, et al.

*Harvey Faurholt (of Horton, Wilkins & Faurholt),* for respondent Nehles, et al.

*Bryan P. Harnetiaux* and *Gregg L. Tinker* on behalf of Washington State Trial Lawyers Association, amicus curiae for appellants.

*Stephen P. Larson* on behalf of Washington Defense Trial Lawyers, amicus curiae for respondents.

TALMADGE, J. — This case arises out of the use of pesticides in the Horse Heaven Hills and their alleged downwind fallout in Badger Canyon, Benton County. The plaintiffs allege that pesticides drifted from the Hills down into the Canyon, onto their homes and farms, damaging their crops and plants. Defendant E.I. DuPont de Nemours & Co., Inc. (DuPont) manufactured the pesticides in question (sulfonylurea herbicides named "Glean", "Harmony" and "Finesse"). Defendant Farmboy Spray Co., Inc. (Farmboy) aerially sprayed them on wheat farms in the Horse Heaven Hills, at the behest of the other 27 Defendants who own the farms (Wheat Growers).

Holding that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.,* preempted Plaintiffs' common-law inadequate warnings actions,[1] because the products' labels are registered under FIFRA, the trial court dismissed various claims against the Defendants. The trial court also dismissed other claims as a matter of law before trial and during trial. After a lengthy trial, the jury rendered a verdict for the Defendants on the remaining claims. Following denial of posttrial motions, Plaintiffs ap-

---

[1]In this opinion, the term "common-law actions" is used to refer to claims for damages brought by private parties, such as tort or breach of contract actions, regardless of whether the law underlying the claim is found today in court decisions or in enactments of the Legislature. *See, e.g.,* RCW 7.72 *et seq.* (products liability) and RCW 62A.2 (sales).

pealed and Defendants cross-appealed. The Court of Appeals, Division Three, certified this case and *Goodwin v. Bacon*, cause 62323-6, to this court. We affirm the trial court's judgment for the Defendants.

## ISSUES

1. Did the trial court err in holding that FIFRA preempted Plaintiffs' claims relating to the adequacy of the pesticide labels?

2. Did the trial court err in dismissing Plaintiffs' claims based on breach of implied warranties?

3. Did the trial court err in using a verdict form that allegedly contradicted the court's instruction on proximate cause?

4. Did the trial court abuse its discretion in responding to a jury inquiry outside the presence of counsel?

In light of this court's disposition of these issues, we do not reach the issues raised on cross-appeal by defendants.[2]

## FACTS

Plaintiffs owned 14 farms and/or homes with gardens in Badger Canyon. Clerk's Papers, at 588, 597. They grow irrigated crops such as alfalfa, walnuts, fruits, asparagus and other vegetables, and ornamental plants such as "baby's breath." Exs. 148, 200; Report of Proceedings vol.

---

[2]DuPont assigns error to evidentiary rulings and jury instructions, and a ruling that other defendants are not liable for damage from liftoff or ground applications. Br. of Def. DuPont, at 1-6. The Wheat Growers and Farmboy urge this Court to overrule *Langan v. Valicopters, Inc.*, 88 Wn.2d 855, 567 P.2d 218 (1977), and hold that aerial crop dusting is no longer an abnormally dangerous activity to which the doctrine of strict liability applies. See RESTATEMENT (SECOND) OF TORTS, §§ 519, 520 (1977). They also contend that strict liability was misapplied to them because long-distance drift is not within the risk that makes the activity abnormally dangerous. See Br. of Resp't Wheat Growers, at 26-42; *Crosby v. Cox Aircraft Co. of Wash.*, 109 Wn.2d 581, 586-87, 746 P.2d 1198 (1987) (declining to hold that airplane flying is abnormally dangerous); *see also Klein v. Pyrodyne Corp.*, 117 Wn.2d 1, 5-12, 810 P.2d 917, *amended*, 817 P.2d 1359 (1991); *Siegler v. Kuhlman*, 81 Wn.2d 448, 455-56, 502 P.2d 1181 (1972) (discussing the problem of "[t]racing the course followed by gases or other poisons" (citation omitted)), *cert. denied*, 411 U.S. 983, 36 L. Ed. 2d 959, 93 S. Ct. 2275 (1973). In light of the Court's opinion, we do not reach these issues.

12, at 12, 73; vol. 11A, at 146;[3] vol. 13A, at 163, 169-70, 187, 192; vol. 20, at 181. They alleged that their plants were damaged or destroyed by pesticides drifting from the Horse Heaven Hills, an area south, west and above the southern wall of the Canyon. Clerk's Papers, at 588-89, 595-96.

The Wheat Growers used the pesticides to kill off competitive, moisture-consuming weeds on their dryland (non-irrigated) wheat farms. Clerk's Papers, at 132-34; Report of Proceedings vol. 15, at 4, 16-19; vol. 11, at 4. There is no dispute that, pursuant to FIFRA, DuPont had registered the pesticides and their labels with the Environmental Protection Agency (EPA). Report of Proceedings vol. 5, at 82-86; vol. 7, at 9; vol. 11, at 47-48; vol. 14, at 78-79; Exs. 3A-E, 4A-D, 5A-B (copies of labels). The labels contain detailed instructions and warnings as to the maximum amount of pesticides to be used, the need for extreme care to avoid drift, and how to safely use the pesticides under particular conditions and in particular states.[4] The labels

---

[3]Designations such as "11A" or "13A" refer to volume 11-A or 13-A of the large set of transcripts filed with this appeal, in accord with the parties' practice.

[4]For example, there are 18 pages of warnings for Glean in the 1989 specimen label. The label sets a maximum application in Washington of one-third ounce per acre. Ex. 3E, at 4. The label is replete with cautions about drift onto desirable plants:

Injury to or loss of desirable trees or vegetation may result from failure to observe the following: Do not apply. . .on or near desirable trees or other plants, or on areas where their roots may extend, or in locations where the chemical may be washed or moved into contact with roots. . . . Prevent drift of spray to desirable plants.

Ex. 3E, at 2. One section of the label urges "CAUTION — AVOID SPRAY DRIFT" and states:

Do not allow spray from either ground or aerial equipment to drift onto adjacent crops or land, as even small amounts will injure other plants. When spraying near adjacent, sensitive crops or plants, do everything possible to reduce spray drift. This includes:

● Stop spraying if wind speed becomes excessive. DO NOT SPRAY IF WIND SPEED IS 10 MPH OR GREATER. Spray drift can occur at wind speeds less

also disclaimed warranty liability.[5]

The Plaintiffs claimed that Farmboy sprayed enough farms in a given period that 1 to 3 percent of each application escaped and collectively contaminated the air,[6] and then would drift into Badger Canyon due to wind patterns, and damage plaintiffs' plants. Report of Proceedings vol. 2, at 199, 300-02; vol. 7, at 70, 76; vol. 8, at 90, 93-94; vol. 11A, at 150-51; vol. 14; vol. 14A, at 123-42, 175-89, 195-96; vol. 20, at 174, 178-81; Reply Br. of Appellants, at 7. Under these circumstances, it was allegedly not possible to trace particular plant damage in the Canyon to

than 10 MPH. If sensitive crops or plants are downwind, extreme caution must be used even in relatively low wind conditions!. . .

Ex. 3E, at 11. This section also warns that "extreme caution" must be used under certain weather conditions, regardless of wind speed; prohibits an application "when an inversion exists"; indicates methods to diminish drift; and concludes that "Extreme care must be taken to prevent drift to desirable plants or nontarget agricultural land." Ex. 3E, at 11. The label further warns of the need to "reduce the potential for movement of treated soil due to wind erosion," and advises that "Injury to adjacent crops may occur when treated soil is blown onto land used to produce crops other than cereal grains." Ex. 3E, at 17.

Despite the foregoing, Plaintiffs did not articulate a breach of express warranty claim in this case. Third Am. Compl.; Clerk's Papers, at 587-92.

[5]The Glean label, like those of the other pesticides, includes a disclaimer of warranty as follows:

NOTICE OF WARRANTY

DuPont warrants that this product conforms to the chemical description on the label thereof and is reasonably fit for purposes stated on such label only when used in accordance with the directions under *normal use conditions*. It is impossible to eliminate all risks inherently associated with the use of this product. Crop injury. . .or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application. . .In no case shall DuPont be liable for consequential, special or indirect damages resulting from the use or handling of this product. All such risks shall be assumed by the buyer. DUPONT MAKES NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE NOR ANY OTHER EXPRESSED OR IMPLIED WARRANTY EXCEPT AS STATED ABOVE.

(Italics ours.) Ex. 3E, at 18.

[6]Other alleged sources of contamination were liftoff (i.e., that pesticide was blown off the ground into the air) and soil movement (i.e., that pesticide adhered to soil that was blown into the air). See Report of Proceedings vol. 12, at 110; vol. 12A, at 182 (drifting dust "comes off by the gallons in the high winds" in the Hills); vol. 19, at 78 ("When [the dust] falls out, you're going to have the effect of the chemical on sensitive vegetation").

particular applications of pesticide in the Hills. Report of Proceedings vol. 2, at 257-58, 301-02; vol. 11, at 9, 33; vol. 11A, at 182.

Plaintiffs filed an action for damages in the Yakima County Superior Court, asserting a variety of very general claims against various Defendants.[7] As against the Wheat Growers and Farmboy, Plaintiffs asserted claims for negligence and strict liability. Before trial, the trial court apparently dismissed the negligence claim against the Wheat Growers.[8] Plaintiffs did not appeal this ruling. The court also dismissed a strict liability claim against the Wheat Growers in connection with ground applications or alleged movement of pesticides from the Wheat Growers' land. Plaintiffs did not appeal this ruling.[9] Report of Proceedings vols. 1 and 2; see also Report of Proceedings vol. 1, at 135 *et seq.;* vol. 2, at 235-41. See generally Third Am. Compl.; Clerk's Papers, at 587-92. Ultimately, as against the Wheat Growers and Farmboy, only a strict liability claim for drift from aerial applications was tried and submitted to the jury.

Against DuPont, Plaintiffs alleged claims for design defect, RCW 7.72.030(1)(a); inadequate warnings/instructions, RCW 7.72.030(1)(b); nonconformity with implied warranties, RCW 7.72.030(2); failure to meet consumer safety expectations, RCW 7.72.030(3);[10] unfair or

---

[7] Plaintiffs sued the State of Washington and the Director of the Department of Agriculture, as well as Washington State University. These claims apparently were dismissed before trial and the Plaintiffs did not appeal this decision.

[8] As part of this negligence claim, it is unclear whether Plaintiffs argued that the detailed label instructions, including the need for extreme care to avoid drift, were violated.

[9] Plaintiffs did not assert a nuisance claim, see RCW 7.48.010; *Riblet v. Ideal Cement Co.*, 57 Wn.2d 619, 358 P.2d 975 (1961) (airborne cement dust); nor a trespass claim, see *Bradley v. American Smelting & Ref. Co.*, 104 Wn.2d 677, 689-91, 709 P.2d 782 (1985) (airborne deposit upon plaintiffs' property of imperceptible particulates may give rise to actions for both nuisance and "trespass by airborne pollutants").

[10] The claim alleging failure to meet consumer expectations was submitted to the jury, with the design defect claim, as one products liability claim under the Products Liability Act (PLA), RCW 7.72 *et seq.* A separate claim is not stated under

deceptive acts or practices in marketing the products for use in the Horse Heaven Hills, RCW 19.86.020, .090; and negligence, RCW 7.72.040(1)(a). Clerk's Papers, at 498-99.

Before trial, the court dismissed certain claims against DuPont which were based upon alleged inadequate testing and marketing of the pesticides for use in the Horse Heaven Hills/Badger Canyon ecosystem. The trial court ruled that FIFRA preempted most of the product claims and the negligence claim to the extent that they were based upon inadequate label warnings. The court also dismissed claims for breach of implied warranties (due to lack of privity), and unfair or deceptive acts under RCW 19.86. Clerk's Papers, at 425-26; Opening Br. of Appellants, at 6-7. The latter claim was not appealed.

At trial, Plaintiffs and Defendants introduced expert opinion and other evidence supporting and rebutting the allegations of long-distance drift causing damage to Plaintiffs' plants.[11] Plaintiffs also introduced evidence supporting what they call "negligence," but which would be better termed "misrepresentation," to the effect that Du-Pont knew of the long-distance drift pattern in the Horse Heaven Hills/Badger Canyon ecosystem, and withheld the relevant information from the EPA, materially affecting the warnings on the labels. Opening Br. of Appellants, at 7 nn.3, 29. At the close of plaintiffs' case, the trial court dismissed this claim because there was no proof that the EPA would have required DuPont to change the labels had DuPont provided the information to the EPA. Clerk's Papers, at 197-98; Report of Proceedings vol. I, at 129-33. Plaintiffs did not appeal this ruling, stating this "was not

RCW 7.72 for the failure to meet consumer safety expectations as the PLA creates a single cause of action for product-related harm with specified statutory requirements for proof. *See Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 860, 774 P.2d 1199, *amended*, 779 P.2d 697 (1989), cited in *Stanton v. Bayliner Marine Corp.*, 123 Wn.2d 64, 71, 866 P.2d 15 (1993), *cert. denied*, ___ U.S. ___, 130 L. Ed. 2d 32, 115 S. Ct. 78 (1994).

[11]*See, e.g.*, Report of Proceedings vol. 2, at 302-03; vol. 7, at 48, 67-70, 74, 76; vol. 8, at 93-94, 109, 119, 168-78; vol. 11, at 13-15, 21, 24; vol. 11A, at 123-24, 150, 183; vol. 14; vol. 14A, at 123-42, 175-89, 195-96, 204; vol. 15, at 7-8, 30-31, 70, 73, 85-89, 96-97, 103, 105, 114; vol. 16, at 13-24; vol. 17, at 22-43, 46-47, 60-61, 66; vol. 20, at 74, 178-81.

the theory of negligence that the plaintiffs desired to proceed on." See Opening Br. of Appellants, at 7 nn. 3 & 29.

Defendants then moved for dismissal of the remaining claims, contending that there was no evidence that any Defendant caused any harm since the proof did not identify the particular pesticides, applications or entities that caused or contributed to the particular injuries. The trial court denied the motion, ruling that Plaintiffs did not have to establish proportions of responsibility or establish the effects of individual applications.[12] Accordingly, the trial court instructed the jury in instruction 5 that Plaintiffs had to prove that a particular defendant used the pesticides, a portion thereof drifted into Badger Canyon and that "the off target drift of the pesticides was a proximate cause of damage to an individual. . . plaintiff's property or crop." Clerk's Papers, at 152. In a special verdict form, the jury was asked:

1. Do you find that any individual aerial application of any pesticide(s) by Farmboy during the period 1986 to 1989 inclusive was a proximate cause of loss or damage to any one or more of the plaintiffs?

 Yes ＿＿　　No ＿＿

 . . . .

4. Do you find that Glean, Finesse or Harmony as manufactured by DuPont were not reasonably safe as designed?

 Yes ＿＿　　No ＿＿

Clerk's Papers, at 211.

While the jury deliberated, the foreman sent the judge

---

[12]In its oral ruling, the court stated that Plaintiffs only had to establish that a portion of a particular Defendant's application "was . . . part of a cloud that then was the proximate cause of damage," Supplemental Report of Proceedings, at 336, or "that an application, either individually or in concert with others . . . was made, drifted and reached Badger Canyon", causing injury, and that if Plaintiffs made this showing, the burden of allocating responsibility would shift to the Defendants. Supplemental Report of Proceedings, at 337-38.

a note asking, "Could we have a definition of 'Preponderance' of the evidence — Also the term 'Proximate Cause'." Without informing counsel of this query, the judge replied in writing, "Please re-read the instructions which define those terms." Clerk's Papers, at 104.

The jury returned the special verdict form in which questions 1 and 4 were both answered "No." The trial court entered a judgment on the verdict of the jury, from which the appellants appealed to the Court of Appeals, Division Three, and from which the respondents sought cross-review. The Court of Appeals certified the case to this court pursuant to RCW 2.06.030. We have received *amicus curiae* briefs on the FIFRA preemption issue from the Washington State Trial Lawyers Association (WSTLA) and the Washington Defense Trial Lawyers.

## DISCUSSION

The central focus of this case, as argued by the parties and certified by the Court of Appeals, Division Three, is the issue of FIFRA preemption. The court's decision with respect to FIFRA preemption is consistent with the court's opinion in *All-Pure Chem. Co. v. Lundberg*, 127 Wn.2d 1, 896 P.2d 697 (1995), and *Goodwin v. Bacon*, 127 Wn.2d 50, 896 P.2d 673 (1995).

A. FIFRA Preemption Analysis

We adhere to a rigorous analysis of the preemption issue because of this court's continuing desire to uphold state sovereignty to the maximum extent, tempered only by the mandate of the supremacy clause of the United States Constitution. We hold that FIFRA preempts only those state common-law actions that are predicated on the allegation that a product label should have had additional or different warnings than those required under FIFRA. This conclusion is mandated by this court's long-standing support for the presumption against preemption of state law by federal enactments, and the plain meaning of FI-

FRA's express preemption clause. It also finds compelling support in an overwhelming wave of appellate court decisions interpreting FIFRA, in which Congress has acquiesced.

## 1. The Presumption Against Preemption

The supremacy clause of the United States Constitution provides that United States law is supreme, notwithstanding any contrary state law. U.S. Const. Art. VI, cl. 2. Accordingly, state law that conflicts with federal law is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114, 2128 (1981), quoted in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 120 L. Ed. 2d 407, 112 S. Ct. 2608, 2617 (1992).

 However, we do not presume that Congress relishes abrogating state authority. Congress is presumed to respect our system of "dual governance."[13] Accordingly, any consideration of preemption issues " 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by. . .Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cipollone*, 112 S. Ct. at 2617 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 91 L.Ed. 1447, 67 S. Ct. 1146, 1152 (1947)). Indeed, we have "repeatedly emphasized" that there is a "strong presumption against finding preemption [of State law] in an ambiguous case. . . . State laws are not superseded by federal law unless that is the clear and manifest purpose of Congress." *Progressive Animal Welfare Soc'y v. University of Washington*, 125 Wn.2d 243, 265, 884 P.2d 592 (1994) (quoting *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 327, 858 P.2d 1054 (1993) (footnotes omitted)). The presumption against preemption is "even stronger with state regulation regarding matters of health and safety," in which

---

[13]The Law of Preemption, A Report of the Appellate Judges Conference, at 45-46 (ABA 1991) ("[the] judiciary presumes that Congress shares the nation's commitment to a dual system of governance. . .[F]ederalism values create a presumption that Congress does not intend to preempt state laws that regulate areas traditionally within the states' legislative purview").

states have traditionally exercised their sovereignty. (citations omitted) *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d at 327.

■ The meaning of the presumption against preemption is two-fold. First, where Congress expressly addresses state authority in a federal law, the preemptive scope of the federal law should not be extended any further by resort to an implied preemption analysis.[14] *Cipollone*, 112 S. Ct. at 2625-26 (Blackmun, J. concurring in part, dissenting in part). "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 112 S. Ct. at 2618. *See Keams v. Tempe Technical Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994) (express preemption provision is "the end of the matter"); *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1522 (11th Cir. 1994) (citing cases), *reh'g denied*, 24 F.3d 256 (11th Cir. 1994), *cert. granted sub. nom, Freightliner Corp. v. Myrick*, 115 U.S. 306, 130 L. Ed. 2d 218, 115 S. Ct. 306 (1994).

■ Second, the presumption against preemption has implications for the construction to be given a preemption provision in federal law. In construing such a provision, the court "must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 123 L. Ed. 2d 387, 396, 113 S. Ct. 1732 (1993). Further, the court should consider whether the preemption clause voids each state law at issue on a case by case basis, giving the clause a "fair but narrow reading" in each case. *Cipollone*, 112 S. Ct. at 2621.

2. Effect of Cipollone

This application of the presumption against preemption is illustrated in the *Cipollone* case. There, the court held

---

[14]Preemption may be express, the result of an actual conflict of laws, or implied where federal law thoroughly occupies a field. *Physicians Ins. Exch.*, 122 Wn.2d at 326 (citing *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 115 L. Ed. 2d 532, 111 S. Ct. 2476, 2481-82 (1991)); *see Cipollone*, 112 S. Ct. at 2617; *Progressive Animal Welfare Soc'y*, 125 Wn.2d at 265.

that the 1969 amendment to section 5(b) of the 1965 Federal Cigarette Labeling and Advertising Act (15 U.S.C. § 1334(b)) was an express preemption provision. *Cipollone*, 112 S. Ct. at 2617. As amended, section 5(b) states:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter.

The court then determined that the phrase "requirement or prohibition" encompassed not only a state's regulatory commands but also common-law duties that underlie common-law actions for damages. The court reasoned that "it is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*." *Cipollone*, 112 S. Ct. at 2620. The court stated that:

> The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. . . .

*Cipollone*, 112 S. Ct. at 2620. Before the *Cipollone* case was decided, this court interpreted the term "requirements" in a federal preemption provision in *Berger v. Personal Prods., Inc.*, 115 Wn.2d 267, 271-75, 797 P.2d 1148 (1990), *cert. denied*, 499 U.S. 961, 113 L. Ed. 2d 649, 111 S. Ct. 1584 (1991). We held in *Berger* that the Federal Medical Device Amendments of 1976 (MDA) (21 U.S.C. § 360k(a)), which proscribed a state "requirement" for product warnings that would vary federal requirements, preempted a state common-law failure to warn action. The federal agency's implementing regulations in *Berger* specified that "requirement" extended to requirements "established by. . .a court decision." 21 C.F.R. § 808.1(b).

After deciding that "requirements and prohibitions" included common-law duties, the Supreme Court in *Cipollone* then separately determined whether each common-law claim was within the scope of the preemption clause. The court stated that:

> The central inquiry in each case is straightforward: we ask whether the legal duty that is the predicate of the common law damages action constitutes a "requirement or prohibition based on smoking and health. . . . imposed under State law with respect to . . .advertising or promotion," giving that clause a fair but narrow reading.

*Cipollone*, 112 S. Ct. at 2621.

The *Cipollone* Court then considered each claim asserted by petitioner. It held that the preemption clause encompassed "failure to warn" claims, because those claims required a showing that the advertising should have included additional or clearer warnings. Significantly, the Court looked to the substance of the claim, and counted both a failure to warn claim and a negligence claim resting on allegations of inadequate testing and marketing as "failure to warn" claims. *Cipollone*, 112 S. Ct. at 2621. In contrast, the Court noted that claims that relied "solely" on testing or research or "other actions unrelated to advertising or promotion" would not be preempted. *Cipollone*, 112 S. Ct. at 2622. The Court held that other common-law actions asserted by petitioner were not preempted because the duties sought to be enforced did not fall wholly within all of the terms and conditions of the preemption clause. *Cipollone*, 112 S. Ct. at 2622-25. For instance, the duty underlying a breach of express warranty claim was held to be voluntarily assumed, not "imposed under State law." *Cipollone*, 112 S. Ct. at 2622. The duties underlying fraudulent misrepresentation and conspiracy claims were held to be duties to not deceive and to not conspire to commit fraud, not duties "based on smoking and health." *Cipollone*, 112 S. Ct. at 2624. Therefore, the Court held that the preemption clause did not preempt claims for conspiracy, fraudulent misrepresentation or breach of express warranty.

### 3. FIFRA's Preemption Provision

Since its enactment in 1947, FIFRA has provided a comprehensive federal scheme for pesticide labeling. *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 601,

115 L. Ed. 2d 532, 111 S. Ct. 2476, 2486 (1991). FIFRA prohibits the sale of pesticides unless the manufacturer registers the label with the EPA. 7 U.S.C. § 136a(a). To register the pesticide, the manufacturer files information including test descriptions and results, the proposed label, the purpose of the pesticide and "any directions for its use." 7 U.S.C. §§ 136a(c)(1)(B)-(D) (1988); *see* 40 C.F.R. § 156 (1992). The EPA reviews the filing and the label, 7 U.S.C. § 136a(c)(5), and determines whether the label information is adequate to protect the public from fraud, injury or "unreasonable adverse" environmental effects. *Chemical Specialties Mfrs. Ass'n v. Allenby*, 958 F.2d 941, 944 (9th Cir. 1992) (California initiative requiring point-of-sale warnings not preempted by FIFRA), *cert. denied*, 506 U.S. 825, 121 L. Ed. 2d 44, 113 S. Ct. 80 (1992); 7 U.S.C. § 136a(c)(5) (registration turns on such factors as whether the product composition warrants the proposed claims for it, whether its labeling complies with FIFRA, and whether it will "generally cause unreasonable adverse effects on the environment" when "used in accordance with widespread and commonly recognized practice").

 FIFRA preempts any contrary labeling requirements. Section 136v of FIFRA states:

(a) . . .

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) . . .

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

This provision plainly is an express preemption clause. *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. at 615; *Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d at 942. In interpreting this statute, this court's duty is to focus on its plain wording. *CSX Transp., Inc. v. Easterwood*, 123 L. Ed. 2d at 396.

Clearly the words "any requirements" in section 136v(b), like the words, "[n]o requirement or prohibition" in the cigarette labeling act, include positive enactments of state lawmaking bodies and common-law duties enforced in actions for damages. There is no discernible difference in meaning between the phrases because the cigarette label preemption clause refers to "requirement[s]" or "prohibition[s]", while section 136v(b) of FIFRA refers only to state "requirements." *See National Broiler Council v. Voss*, 44 F.3d 740, 745 (9th Cir. 1994) (federal preemption of state poultry labeling "requirements" preempts state poultry labeling prohibitions); *National Bank of Commerce v. Kimberly-Clark Corp.*, 38 F.3d 988, 991 (8th Cir. 1994) (MDA preemption of state-imposed warning "requirements" is equivalent to the phrase "requirement[s] or prohibition[s]" in the cigarette act). It would be anomalous to rule that a state could avoid FIFRA labeling preemption merely by formulating its own labeling law in terms of a "prohibition" rather than a "requirement." *See Voss*, 44 F.3d at 744. The plain wording of section 136v(b) amounts to a Congressional command that no state shall enforce any "requirements"—including duties underlying common law actions—"for labeling or packaging in addition to or different from those required" under FIFRA.

In this conclusion, we agree with what counsel in *All-Pure* at oral argument described as a "tsunami" wave of precedent, including every one of the eight federal circuit courts that have addressed the issue of FIFRA preemption since *Cipollone*, and the overwhelming majority of federal district and state courts as well. *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555 (9th Cir. 1995); *Bice v. Leslie's Poolmart, Inc.*, 39 F.3d 887 (8th Cir. 1994); *MacDonald v. Monsanto Co.*, 27 F.3d 1021 (5th Cir. 1994); *Lowe v. Sporicidin International*, 47 F.3d 124, (4th Cir. 1995) (citing *Worm v. American Cyanamid Co.*, 5 F.3d 744 (4th Cir. 1993)); *King v. E.I. DuPont de Nemours & Co.*, 996 F.2d 1346 (1st Cir.), *cert. dismissed*, 510 U.S. 985, 126 L. Ed. 2d 440, 114 S. Ct. 490 (1993); *Shaw v. Dow Brands, Inc.*, 994 F.2d 364 (7th Cir.

1993); *Papas v. Upjohn Co.*, 985 F.2d 516 (11th Cir.), *cert. denied*, 510 U.S. 913, 126 L. Ed. 2d 248, 114 S. Ct. 300 (1993); *Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 981 F.2d 1177 (10th Cir.), *cert. denied*, 510 U.S. 813, 126 L. Ed. 2d 30, 114 S. Ct. 60 (1993);[15] *see also, e.g., Casper v. E.I. DuPont De Nemours & Co.*, 806 F. Supp. 903, 907 (E.D. Wash. 1992). The United States Supreme Court, seven federal courts of appeal, dozens of district courts and state courts all concur: in preempting state labeling "requirements," Congress intended to preempt both direct labeling regulations and common-law labeling duties enforced through damages actions. This rapidly expanding consensus is weighty persuasive authority.

Of equal significance is the fact that Congress has remained silent in the face of *Cipollone* and its FIFRA progeny. Once a statute has been construed by a high court, the construction may become, in effect, a part of the statute. *State v. Regan*, 97 Wn.2d 47, 51-52, 640 P.2d 725 (1982). If the interpretation of congressional purpose by so many courts were incorrect, Congress could enact corrective legislation. Its silence here—in the face of a uniform, widespread and rapidly growing wave of precedent—may be deemed a conscious acquiescence in the conclusion we and others have reached. Congress' failure to reject a statutory interpretation adopted by numerous lower courts may "argue[ ] significantly in favor of acceptance" of that interpretation by the United States Supreme Court. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 733, 44 L. Ed. 2d 539, 95 S. Ct. 1917, *reh'g denied*, 423 U.S. 884, 46 L. Ed. 2d 114, 96 S. Ct. 157 (1975); *see also State v. Coe*, 109 Wn.2d 832, 846, 750 P.2d 208 (1988) (after a substantial period of time, legislative inaction may be deemed acquiescence in the court's decision); *State ex rel. Chealander v. Morgan*, 131 Wash. 145, 229 P. 309

---

[15]In *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1541 (D.C. Cir.), *cert. denied*, 469 U.S. 1062, 83 L. Ed. 2d 432, 105 S. Ct. 545 (1984), the court ruled that FIFRA preempted only a state's direct regulatory command and not its common-law duties. As noted in *Shaw v. Dow Brands, Inc.*, 994 F.2d at 370, this argument "evaporated" with the decision in Cipollone.

(1924) (fact that Legislature met twice since Washington Supreme Court interpreted statute without amending the statute indicates acquiescence in court's interpretation).

Our conclusion that common-law duties and state regulatory commands both may be state "requirements" preempted by the federal labeling law also furthers the policies of uniformity. In the federal labeling law involved here, as in *Cipollone*, Congress has decided that the federal government will determine the appropriate warnings for a product, and that the warnings shall be uniform for the whole nation. This precludes allowing the appropriate warnings to be worked out through private actors and the tort systems of the states. Contrary to arguments of the plaintiffs and WSTLA, common-law duties and direct regulatory commands must both be deemed "requirements" for purposes of FIFRA preemption, so that the EPA's decisions as to uniform labeling standards for pesticides are not undermined through decisions by juries in the 50 states.

The other arguments of Plaintiffs and WSTLA are without merit.[16]

4. Preemption of Plaintiffs' Claims

■ Having decided that section 136v(b) preempts common-law duties, we must determine which of plaintiffs' claims based upon those duties are preempted. We can do no better than to adapt the United States Supreme Court's approach in *Cipollone*: the central inquiry in each case is whether the legal duty that is the predicate of the

---

[16]WSTLA argues that Congress could not have intended to leave victims of pesticide-related harm without a remedy. Br. of WSTLA, at 24. However, in the appropriate case involving pesticides, plaintiffs could have claims against pesticide manufacturers, applicators, and landowners under a variety of theories. *See, e.g., Cipollone*, 112 S. Ct. at 2622-25.

It is also argued that FIFRA's § 136v(a) reduces the preemptive scope of § 136v(b). In *Mortier*, the Court stated that § 136v(a) does not "serve to hand back to the states powers that the statute had impliedly usurped. Rather, it acts to ensure that the states [can] continue to regulate use and sales even where, such as regard to the banning of mislabeled products, a narrow preemptive overlap might occur." 111 S. Ct. at 2486. *See also Chemical Specialties*, 958 F.2d at 943 (state may prohibit the sale of a pesticide within its borders but could not require a change in the label).

common-law damages action constitutes a State "require-ment[ ] for labeling or packaging in addition to or differ-ent from" the FIFRA requirements, giving that clause a fair but narrow reading. 7 U.S.C. § 136v(b); *Cipollone*, 112 S. Ct. at 2621.

Plaintiffs' claim based upon inadequate warnings or instructions is predicated upon a state duty to provide warnings and instructions that are necessary to make a product reasonably safe. RCW. 7.72.030(1). Clearly, this duty constitutes a requirement for labeling or packaging in addition to or different from the information required under FIFRA. The gist of plaintiffs' case is that pesticides like those at issue here should not be used in an area like the Horse Heaven Hills/Badger Canyon ecosystem, where there is a risk of long distance drift or mass air contamina-tion. Clearly, this sort of caution should go on the label. The labels for the pesticides at issue in this case contain dozens of detailed warnings and instructions, including warnings for specific states, warnings to use "extreme cau-tion" to avoid drift if desirable plants are "downwind," even under low wind conditions, and specific instructions as to how to avoid drift. Therefore, the plaintiffs' inade-quate warnings claim was correctly ruled preempted by the trial court.

The trial court also correctly held that plaintiffs' "negligence" claim against DuPont was preempted.[17] The Plaintiffs' negligence theory is not clearly articulated. The "negligence" claim against DuPont resting upon alleged improper or inadequate testing or marketing was merely another way of contending that the labels should have warned against use in the Horse Heaven Hills or long-distance drift. As the United States Supreme Court ruled in *Cipollone*, the "negligence" claim in this case, which was predicated upon the manufacturer's alleged deficien-cies in testing and marketing, was, in actuality, a "failure

[17]Plaintiffs did not appeal the trial court rulings dismissing their negligence case against the Wheat Growers and Farmboy.

to warn" claim that is preempted. *See Cipollone*, 112 S. Ct. at 2621.

To the extent that the negligence claim is product-based, Washington's Product Liability Act (RCW 7.72 *et seq.*) provides for a single cause of action against the product manufacturer. *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 853, 774 P.2d 1199, 779 P.2d 697 (1989), *cited in Physicians Ins. Exchange*, 122 Wn.2d at 323. This "negligence" theory would be subsumed under plaintiffs' action against DuPont under RCW 7.72.

We need not decide whether FIFRA preempts plaintiffs' other "negligence" claim which alleged that DuPont failed to provide required information to the EPA that would have changed the approved labels. This "negligence" claim, which was more in the nature of a "misrepresentation" theory, was dismissed for lack of evidence on a motion for a directed verdict and plaintiffs have not appealed that ruling. Clerk's Papers, at 197-98.[18]

Contrary to DuPont's view, claims for design defects or products liability that do *not* attack the label's adequacy under FIFRA are not preempted, as they are predicated upon a manufacturer's duty to make a product that is reasonably safe. In *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir. 1993), the court stated that claims for "negligent testing, manufacturing, and formulating [of a product] are not preempted" under FIFRA. Although the "line between a claim for mislabeling and a claim for a deficient product may not always be clear,"

---

[18]In *Cipollone*, the Supreme Court held that claims of fraud or conspiracy to commit fraud, alleging that the manufacturers withheld information about health effects of smoking, were not preempted because the duty involved was one not to deceive, not a duty "based on smoking and health." 112 S. Ct. at 2623-25. *See Roberson v. E.I. DuPont de Nemours & Co.*, 863 F. Supp. 929, 933-35 (W.D. Ark. 1994) (allowing a claim that DuPont misled the EPA); *In re DuPont-Benlate Litig.*, 859 F. Supp. 619 (D.P.R. 1994) (failure to warn not preempted where DuPont allegedly withheld known defects in the production of a particular batch of pesticides). See also *National Bank of Commerce*, 38 F.3d at 993. The issue is whether withholding information from the EPA violated a duty that is a state-imposed "requirement for labeling or packaging in addition to or different from" the FIFRA requirements. As noted, the court found there was no evidence that DuPont withheld anything that would have changed the label.

the court said, one should resolve the issue by asking whether the deficiency is in the product or in the label, "looking to, as one factor, whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or the label." *Worm*, 5 F.3d at 747-48. The trial court correctly ruled that Plaintiffs' design defect claims were not preempted by FIFRA, although the jury's verdict on that issue was for the Defendants.

### B. Implied Warranty Claims

Citing RCW 7.72.030(2) (Clerk's Papers, at 498-99), plaintiffs alleged that the pesticides were not reasonably safe because they failed to conform to the implied warranties under RCW Title 62A. It is uncontested that plaintiffs were not in privity with DuPont. They neither purchased the pesticides from DuPont nor relied upon DuPont with respect to the pesticides. They were not even known to DuPont. On DuPont's motion for summary judgment, the trial court dismissed this claim because there was not a sufficient connection between plaintiffs and DuPont. Clerk's Papers, at 425-26. Plaintiffs assign error to this ruling.

Plaintiffs believe that the plain meaning of the PLA is that any person harmed by a product can hold the manufacturer liable under the PLA if the product is defective in its design, its warnings, its construction, or its nonconformity with express or implied warranties. They argue that RCW 7.72.030(2) provides "a claimant" with a cause of action for harm proximately caused by a product that "was not reasonably safe in construction or not reasonably safe because it did not conform to the manufacturer's express warranty or to the implied warranties under Title 62A RCW." Plaintiffs then turn to RCW 7.72.010(5), which defines a "claimant" as "any" person who suffers harm "even though the claimant did not buy the product from, or enter into any contractual relationship with," the seller. Opening Br. of Appellants, at 37.

DuPont defends on the basis of RCW 7.72.030(2)(c), which states that "[w]hether or not a product conforms to an implied warranty created under Title 62A RCW shall be determined under that title." DuPont argues that this must mean that liability under the PLA in connection with an alleged breach of an implied warranty must be "determined under. . .the UCC." Br. of DuPont, at 43. DuPont contends that horizontal or vertical privity is required under the UCC for an implied warranty claim, *citing Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Constr., Inc.*, 119 Wn.2d 334, 831 P.2d 724 (1992). It argues that the plaintiffs' implied warranty claim was properly dismissed because privity is not present.

We have not yet decided whether privity is required in an implied warranty claim under the PLA. *Touchet Valley* addressed the types of horizontal and vertical connections required for breach of warranty claims brought under the UCC, and expressly did "not address these issues with regard to the WPLA." 119 Wn.2d at 343. We do not need to reach the issue of privity under RCW 7.72.030(2) here.

RCW 7.72.030(2)(c) states that the question of the conformity of a product with "an implied warranty created under Title 62A RCW shall be determined under that Title." Under Title 62A, implied warranties include the implied warranties of fitness for a particular purpose, merchantability and those arising from course of dealing or usage of trade. RCW 62A.2-314, -315. The warranty of merchantability encompasses considerations of fitness for ordinary purposes as well as the adequacy of the package and label. RCW 62A.2.314(2). Unlike express warranties which are voluntarily undertaken, implied warranties are a "requirement" imposed under state law. *Compare Cipollone*, 112 S. Ct. at 2622 (holding that express warranty claim is not preempted under FIFRA because the relevant duty is one voluntarily assumed by the parties and is not

imposed by state law). No implied warranties arise if they are excluded. RCW 62A.2-314(1), (3), -315, -316.[19]

 However, on appeal and in the proceedings below, plaintiffs failed to specify the alleged nonconformity, or indicate which implied warranty was not honored by Du-Pont. See Opening Br. of Appellants, at 35-37.[20] Plaintiffs do not allege anything "wrong" with the pesticides at all, other than the claim that they should not be used in an area allegedly prone to long distance drift, like the Horse Heaven Hills. As discussed above, this defect or nonconformity, if it is one, is the sort of problem that would be cured by adopting an appropriate warning or instruction on the pesticide label. Plaintiffs' implied warranty claims would again appear to be an attack upon the adequacy of the label warnings, and the dismissal of such claims is proper because they are preempted under FIFRA.[21] *See Lowe v. Sporicidin Int'l, supra,* 47 F.3d 124, at 129 n.4.

C. Allegedly Contradictory Jury Verdict Form

Plaintiffs contend that the trial court erred in using a special verdict form that allegedly contradicted its instruction on causation. Special verdict question 1 asked:

Do you find that any individual aerial application of any pesticide(s) by Farmboy during the period 1986 to 1989 inclusive was a proximate cause of loss or damage to any one or more of the plaintiffs?

Plaintiffs contend special verdict question 1 misstated the applicable law, and could have misled the jury. They argue

---

[19]DuPont expressly disclaimed liability for consequential, special or indirect damages and expressly and conspicuously disclaimed making a warranty of fitness for a particular purpose or merchantability. Ex. 3E, at 18.

[20]We cannot presume to make an argument a party fails to make. *See, e.g., Conard v. University of Washington,* 119 Wn.2d 519, 537, 834 P.2d 17 (1992) (declined to decide inadequately briefed constitutional issue), *cert. denied,* 510 U.S. 827, 126 L. Ed. 2d 59, 114 S. Ct. 91 (1993).

[21]In addition, it is noteworthy that the jury specifically found that no pesticide applications proximately caused any loss or injury to Plaintiffs.

that "there was absolutely, under the situation existing on the Horse Heaven [Hills], no way that [any harm due to an individual application] could ever be proven." Report of Proceedings vol. 2, at 257-58. However, they concede that instruction 5 properly set forth the law on causation and allowed them to argue their theory of the case.

The Wheat Growers answer that there is no error in the special verdict form, and it did not conflict with instruction 5. They argue that the special verdict form was "dictated by the evidence" which showed that in each year there were particular defendant wheat farmers who did not use the pesticides at issue or who for other reasons could not have contributed to any pesticide drift. Br. of Wheat Growers, at 12. Moreover, they argue, the instructions and special verdict form questions, taken as a whole, could not have misled the jury. Br. of Wheat Growers, at 8-10.

The trial court correctly determined that plaintiffs did not have to prove or apportion individual causal responsibility.[22] Rather, plaintiffs' burden was, as the trial court ruled, to prove that a portion of a particular application "was. . .part of a cloud that then was the proximate cause of damage." Supplemental Report of Proceedings, at 336-37. Thus, instruction 5 correctly stated that plaintiffs had to prove that a particular defendant applied the pesticides at issue, a portion of an application drifted and entered Badger Canyon and "the off target drift *of the pesticides* was a proximate cause of damage to an individual-

---

[22]*See Martin v. Abbott Labs.*, 102 Wn.2d 581, 689 P.2d 368 (1984) (eliminating "individual causal responsibility" in DES cases); *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 245, 744 P.2d 605 (1987) (plaintiff need establish only that defendant's asbestos products were among those in the plaintiff's work environment); *Benton City v. Adrian*, 50 Wn. App. 330, 341, 748 P.2d 679 (1988) (where plaintiff suffers indivisible damage caused by the combined flow of defendants' excess irrigation waters, it is error to dismiss action on ground that damages are not "sufficiently individualized and traceable to each defendant" and defendants have the burden of proving their individual contributions); *Phennah v. Whalen*, 28 Wn. App. 19, 26-27, 621 P.2d 1304 (1980) (joint and several liability for indivisible harm caused by successive tortfeasors), *review denied*, 95 Wn.2d 1026 (1981).

. . .plaintiff's property or crops within a particular year."
(Italics ours).

██ ██ Jury instructions are sufficient if they allow the
parties to argue their theories of the case, do not mislead
the jury and, when taken as a whole, properly inform the
jury of the law to be applied. *Adcox v. Children's Orthope-
dic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 36, 864 P.2d 921
(1993); *Farm Crop Energy, Inc. v. Old Nat'l Bank*, 109
Wn.2d 923, 933, 750 P.2d 231 (1988). On appeal, errors of
law in jury instructions are reviewed de novo, and an
instruction's erroneous statement of the applicable law is
reversible error where it prejudices a party. *State v. Wan-
row*, 88 Wn.2d 221, 559 P.2d 548 (1977).[23]

██ We do not find that the special verdict form here
contained a clear misstatement of the law that could have
misled the jury in a prejudicial manner. Instruction 5
defined when there would be liability. The special verdict
form asked the jury to determine whether liability had
been proved, i.e., whether the plaintiffs had shown by
competent evidence that *any* of the applications was a
cause of harm to *any* of the plaintiffs. Question 1 in the
special verdict form did not require the jury to find that a
single application drifted and caused particular damage,
but allowed the jury to consider whether an application
caused any part of any damage to any plaintiffs' plants.

The plaintiffs were able to argue that their theory was
long-distance drift of a cloud of pesticides formed from
many individual applications over the Horse Heaven Hills.
In fact, that was the *only* causal theory they argued or
sought to prove. *All* of the plaintiffs' proof over a nine-
week trial—including lay testimony, extensive expert
opinion testimony, and even lengthy studies of drift pat-
terns in the Horse Heaven Hills—was directed only to
proving long-distance drift of a homogeneous cloud formed

[23]The Wheat Growers are incorrect in asserting that an abuse of discretion
standard applies. *Douglas v. Freeman*, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991).
There, the court clearly limited its use of the abuse of discretion standard to
questions over the number and specific wording of jury instructions.

from numerous individual applications. The jury was properly instructed on liability and knew that the plaintiffs only had to prove that a particular Defendant's individual application contributed to a cloud that proximately caused damage. The jury could not have been misled by any possible indication to the contrary in question 1 and the trial court was correct in denying plaintiffs' motion for a new trial.

D. Response to Jury Inquiry

The plaintiffs claim error with respect to the trial court's handling of a jury note. When the foreman requested definitions of proximate cause and preponderance of the evidence, the judge did not inform counsel of the jury note or provide additional instructions, but merely directed the jury members to "re-read the instructions" they had already received.

Plaintiffs argue that these facts warrant a new trial on the authority of *Iverson v. Pacific Am. Fisheries*, 73 Wn.2d 973, 442 P.2d 243 (1968). There, the court stated in dicta that failure to give additional instructions in open court makes a verdict "questionable if not suspect," but "leaves the door open for a possible showing by the prevailing party" that the errors in procedure were "not really prejudicial." *Iverson*, 73 Wn.2d at 976.

A trial court has discretion in deciding whether to give additional instructions. *State v. Ng*, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). In the instant case, there was no abuse of discretion in refusing to give additional instructions. First, the jury did not ask for *additional instructions*. The note requested "a definition" of "preponderance" of the evidence and "proximate cause". The judge's direction to "re-read the instructions which define those terms" was an appropriate response to a narrow request. Presumably, the jury reread the instructions defining those terms, as it did not request any additional definitions.

Second, the trial court did not commit reversible

error in failing to respond to the jury inquiry in open court with counsel present. Where a trial court is asked for additional instructions by a jury, it is preferable to respond to a jury inquiry in open court. However, where the court merely responds to a narrow request for clarification by telling the jury to read the instructions already given, any error in failing to make that response in open court before counsel is harmless. *See, e.g., State v. Safford,* 24 Wn. App. 783, 794, 604 P.2d 980 (1979) (judge wrote to jury, "read the instructions"), *review denied,* 93 Wn.2d 1026 (1980); *State v. Langdon,* 42 Wn. App. 715, 717-18, 713 P.2d 120 (and cases cited therein), *review denied,* 105 Wn.2d 1013 (1986). Accordingly, the denial of the motion for a new trial is affirmed.

## CONCLUSION

The trial court did not err in its rulings with respect to FIFRA preemption and plaintiffs' warranty theories. The trial court did not err in denying plaintiffs' motion for a new trial on the basis of the special verdict form or its handling of the jury inquiry. The judgment of the trial court is affirmed, with costs on appeal to respondents.

DURHAM, C.J., DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, and ALEXANDER, JJ., and UTTER, J. Pro Tem., concur.